UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 19-101 (SRN/KMM)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | GOVERNMENT'S RESPONSE TO |
| v. | ) | DEFENDANT'S PRETRIAL MOTIONS |
| | ) | |
| AARON RHY BROUSSARD, | ) | |
| | ) | |
| Defendant. | ) | |

COMES NOW the United States of America, by and through its undersigned

attorneys, W. Anders Folk, Acting United States Attorney for the District of Minnesota,

and Thomas M. Hollenhorst, Assistant United States Attorney, and responds to the pretrial

motions filed by the defendant, Aaron Rhy Broussard.

I.   Statement of Facts

On April 10, 2019, the defendant was charged in the indictment with conspiracy

(Count 1), importation of fentanyl (Count 2), possession with the intent to distribute

fentanyl (Count 3), and 18 related drug possession and distribution offenses (Counts 4-21),

many resulting in death or serious bodily injury, all in violation of Title 21 of the United

States Code.   A brief description of the facts and circumstances of the case can be found

in the Government's Motion for Detention (Doc. 16).

The defendant has filed a 61-page brief which includes all of his pretrial motions

(hereinafter referred to as "Def. Br.").   The Clerk of Court has filed the brief under eight

separate docket entries (Doc. 44-51).   The government will respond to each docket entry

separately.

## II.   Response to Motions

A.   Motion To Dismiss Indictment (Doc. 44) (Claims 1-11, 43-44, 46)

The defendant asks the Court to dismiss the indictment on several grounds, mostly under the guise of prosecutorial misconduct.   Before addressing these claims, a brief explanation of the government's theory of the case might be helpful.

The government's evidence will show that the defendant obtained a wide-variety of illicit drugs from "Grace" (true name unknown), a China-based internet drug distributor. The defendant would receive the drugs in the mail, repackage them, and then sell them to his many customers throughout the United States using several online internet services and accounts.

The evidence will show that on March 12, 2016, the defendant placed an order with "Grace" for 100 grams of 4-fluoroamphetamine ("4-FA"), which was received by him on March 18, 2016.   4-FA is a compound that is structurally similar to amphetamine, a schedule II controlled substance.   The only difference between the two compounds is that 4-FA has a fluorine atom (instead of a hydrogen atom) bonded to the fourth carbon atom of the molecule's benzene ring.   *See* Figures 1 and 2, below.





Figure 1 – 4-fluoroamphetamine ($C_9H_{12}NF$)          Figure 2 – Amphetamine ($C_9H_{13}N$)

The government's evidence will show that 4-FA is not only structurally similar to amphetamine, but that it has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the effects of a schedule I or II controlled substance.   For these reasons, the government will show that 4-FA meets the definition of a controlled substance analogue.   *See* 21 U.S.C. § 802(32)(A); *United States v. Carlson*, 810 F.3d 544 (8th Cir. 2016) (affirming conviction for charges involving 4-FA and numerous other controlled substance analogues).

The government's evidence will also show that in April 2016, the defendant filled numerous customer orders for 4-FA.   What these customers received from the defendant, however, were lethal dosages of fentanyl.   One theory of the government's case is that instead of sending 100 grams of pure 4-FA to the defendant, "Grace" sent either fentanyl-laced 4-FA or some other compound laced with fentanyl.   The evidence suggests that the defendant may not have known that the drugs he received from "Grace" contained fentanyl, although the government does not concede this point and reserves the right to argue at trial that the defendant either knowingly distributed fentanyl to his customers or did so with "willful blindness."   In any event, even if the defendant believed that he was distributing 4-FA to his customers, the substantive fentanyl distribution counts of the indictment are sound for the reasons that follow.

When proving a drug distribution count, it is well-settled that the government need only prove that (1) the defendant distributed the specific controlled substance alleged in the indictment; and (2) that the defendant knew at the time that it was a controlled substance of some type, but not necessarily the type alleged in the indictment.   *See, e.g., United*

*States v. Ramos*, 814 F.3d 910, 915 (8th Cir. 2016) ("The Government is not required to prove that the defendant actually knew the exact nature of the substance with which he was dealing.  The 'knowingly' element of the offense refers to a general criminal intent, i.e., awareness that the substance possessed was a controlled substance of some kind.") (internal quotation marks and alterations omitted); *United States v. Ali*, 735 F.3d 176, 186 (4th Cir. 2013) ("[W]hile [21 U.S.C. § 841(a)(1)] requires specific intent to distribute a controlled substance or to possess with intent to distribute a controlled substance, it does not require that the defendant have, within that intent, specific knowledge of the controlled substance or any of the chemicals, derivatives, isomers, esters, ethers, or salts that constitute the controlled substance."); *United States v. Abdulle*, 564 F.3d 119, 125 (2d Cir. 2009) ("[T]he law is settled that a defendant need not know the exact nature of a drug in his possession to violate § 841(a)(1); it is sufficient that he [or she] be aware that he [or she] possesses some controlled substance.") (internal quotation marks and citations omitted); *United States v. Carrera*, 259 F.3d 818, 830 (7th Cir. 2001) ("The government need only prove that the defendant was aware that some controlled substance was involved.").  So, for example, if a drug courier delivers a box containing a pound of methamphetamine to a drug distributor, believing it to be marijuana, he or she is guilty of the offense of distribution of methamphetamine.

That 4-FA is, in the first instance, a "controlled substance analogue" does not change the equation.  Under federal law, controlled substance analogues are themselves treated as "controlled substances" *for all purposes*.  21 U.S.C. § 813(a) ("A controlled substance analogue shall, to the extent intended for human consumption, be treated, for the

purposes of any Federal law as a controlled substance in schedule I.”); *McFadden v. United States*, 576 U.S. 186, 193-94 (2015); *United States v. Sharp*, 879 F.3d 327, 337 (8th Cir. 2018).   As such, even if the defendant believed that he was distributing 4-FA, he can nevertheless be held accountable for distributing fentanyl if the government proves that 4-FA is, indeed, a controlled substance analogue which the defendant intended for human consumption.

### 1.   Exculpatory Evidence (Claim 1)

The defendant states that he “believes the government has withheld exculpatory alleged evidence solely to achieve probable cause for multiple counts . . . .”   Def. Br. 2. His only support for this claim comes from Def. Exh. 1 and 2.[1]   But those documents provide him with the very information he claims has been withheld.   In any event, the government has provided full discovery to the defendant and will continue to do so whenever additional evidence is obtained by the government during the course of this prosecution.   Finally, whatever discovery may or may not have been provided to the defendant in the Middle District of Pennsylvania is irrelevant as that case has been dismissed.

### 2.   Proceedings Before the Grand Jury (Claim 2)

The defendant asserts that he “believes the government has failed to provide information about law, or provided misinformation about such law to the grand jury, in

---

1.   The defendant filed 19 exhibits in support of his motions.   *See* Doc. 52 and 53. For ease of reference, these exhibits will be cited as “Def. Exh.”   Def. Exh. 1 was written by Special Agent Terry Olstad from the DEA to provide attorneys and other law enforcement personnel in Minnesota and elsewhere with a brief summary of the case.

regards to an alleged controlled substance analogue's legal status."   Def. Br. 4.   This, and other claims, concerning matters before the grand jury should be rejected.

"[G]rand jury proceedings are afforded a strong presumption of regularity, and a defendant seeking to overcome that presumption faces a heavy burden."   *United States v. Kouba*, 822 F.2d 768, 774 (8th Cir. 1987) (citing *United States v. Hintzman*, 806 F.2d 840, 843 (8th Cir.1986)); *see also United States v. Boykin*, 679 F.2d 1240, 1246 (8th Cir.1982) ("It is well settled that there is a strong presumption of regularity accorded to grand jury findings . . . . A heavy burden is placed on one who seeks to overturn the presumption that an indictment returned by a legally constituted body is founded on competent evidence.") (internal citation omitted).

Moreover, "grand jury testimony is generally not discoverable on pretrial motion." *United States v. Pelton*, 578 F.2d 701, 709 (8th Cir. 1978).   "[G]rand jury transcripts need only be released by the government insofar as required under the Jencks Act . . . ."   *United States v. Wilkinson*, 124 F.3d 971, 977 (8th Cir. 1997) (referencing 18 U.S.C. § 3500). "While the Federal Rules of Criminal Procedure authorize disclosure of grand jury transcripts under certain circumstances, . . . parties seeking such disclosure 'must show a "particularized need," and the decision to permit disclosure lies within the sound discretion of the trial judge . . . .'"   *Id.* (referencing Fed. R. Crim. P. 6(e)(3) and citing *United States v. Benson*, 760 F.2d 862, 864 (8th Cir. 1985)).   Rule 6 authorizes the court to disclose a grand jury transcript "at a time, in a manner, and subject to any other conditions that it directs . . . preliminary to or in connection with a judicial proceeding; [or] at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a

6

matter that occurred before the grand jury . . . ."  Fed. R. Crim. P. 6(c)(3)(E)(i) & (ii). But, the burden rests on the defendant "to show a particularized need for this testimony." *Wilkinson*, 124 F.3d at 977.

In addition, a defendant has a heavy burden in seeking a dismissal of the indictment on the basis of prosecutorial misconduct before the grand jury.  *See Kouba*, 822 F.2d at 774.  A dismissal for prosecutorial misconduct before the grand jury is warranted only upon a showing of actual prejudice to the accused.  *See United States v. McKie*, 831 F.2d 819, 821 (8th Cir. 1987); *Kouba*, 822 F.2d at 774; *United States v. Carr*, 764 F.2d 496, 498 (8th Cir. 1985).

Finally, "[i]t is well settled that an indictment returned by a legally established and unbiased grand jury 'is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence.'" *United States v. Roach*, 28 F.3d 729, 739 (8th Cir. 1994) (quoting *United States v. Calandra*, 414 U.S. 338, 345 (1974)). Absent some evidence of gross purposeful deception by the government, an indictment will not be overturned because it is possible that some of the evidence presented to the grand jury may have permitted an erroneous adverse inference.  *See United States v. Levine*, 700 F.2d 1176, 1179 (8th Cir. 1983).  An indictment should not be dismissed if there is some competent evidence to sustain the charges issued.  *See United States v. Johnson*, 767 F.2d 1259, 1275 (8th Cir. 1985) (finding that even if agent perjured himself before grand jury, dismissal is not proper where defendants had not shown that grand jury heard no evidence competent to sustain indictment).  *Accord Levine*, 700 F.2d at 1180.

The defendant has presented no evidence of actual prejudice or purposeful deception by the government. His "belief" that certain nefarious matters occurred in connection with the grand jury proceedings falls far short of establishing his heavy burden when seeking a dismissal of the indictment or in compelling review of grand jury materials. The defendant is not without a remedy. He will have every opportunity to challenge the government's evidence and legal theories at trial. If acquitted, he will have prevailed. If convicted, his grand jury claims would likely have no merit on appeal. *See United States v. Mechanik*, 475 U.S. 66, 70 (1986) ("[T]he petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt. Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt.").

### 3.  False Narrative Before the Grand Jury (Claims 3 and 4)

The defendant next asserts that he "believes the government presented a false narrative of purposeful distribution of a controlled substance, fentanyl . . . ." Def. Br. 13. Again, the defendant provides no support for this assertion. His "belief" as to what occurred before the grand jury falls far short of showing actual prejudice or a "particularized need" as to why he is entitled to disclosure of grand jury materials.

### 4.  The Government's Detention Argument (Claims 5 and 6)

The defendant takes issue with the government's argument at the detention hearing concerning his failure to notify customers of "the alleged mix-up" concerning the lethal dose of fentanyl he distributed in April 2016. Def. Br. 13. The government will present

evidence at trial that the defendant likely had knowledge of at least one overdose contemporaneously with his distribution of these lethal doses. This could have saved lives, as some of the victims in this case may have overdosed only after the defendant learned of the "mix-up." Although the Court gave little weight to this argument at the detention hearing, the government believes it was proper to support its assertion that the defendant posed a grave danger to the community. Furthermore, this evidence will be presented at trial to show the defendant's knowledge that the drugs he was distributing were intended for human consumption. The evidence will also provide support for the government's argument that the defendant was willfully blind to the true nature of the drugs he was distributing.

### 5.   The Continued Distribution of Illicit Drugs (Claim 7)

The defendant asserts that he "believes the government presented an argument [to the grand jury] of continued distribution after the knowledge of overdoses was allegedly acquired by the defendant." Def. Br. 14. Assuming *arguendo* that the government presented such evidence to the grand jury, it would have been perfectly fine for it to do so. The defendant is charged with a conspiracy spanning from 2014 to December 6, 2016. The government will prove at trial that, even after the defendant had distributed lethal doses of fentanyl to customers and learned of resulting overdoses, he continued to distribute additional drugs to his customers. This evidence will not only help to prove the nature of the ongoing conspiracy, but will provide evidence that the defendant knew that the substances he was distributing were intended for human consumption, which is an essential element of the offense concerning most of the charged offenses. *See* 21 U.S.C. § 813(b).

The evidence will also establish that the defendant was willfully blind as to the nature of the drugs he was distributing to his customers.

### 6.   Knowledge of the Nature of the Drugs (Claim 8)

The defendant asserts that he "believes the government presented a misleading position to the grand jury, arguing that the defendant should have been conscious or was conscious of a possibility that the alleged substance he allegedly . . . distributed was a federal controlled substance.  Def. Br. 14.  This claim should be rejected for the same reasons as outlined above.

### 7.   Other Witnesses at the Grand Jury (Claim 9)

The defendant has expanded his various claims to witnesses called before the grand jury stating, "[i]t's highly probable that witnesses committed misconduct during the grand jury proceeding."  Def. Br. 16.  Again, the defendant provides absolutely no support for this claim.  Moreover, the government only presented one witness to the grand jury – Special Agent Terry Olstad from the DEA.

### 8.   Motives of the Prosecutors (Claim 10)

The defendant raises various claims alleging vindictive prosecution.  Def. Br. 17. As to the claim that the prosecutor in the Middle District of Pennsylvania "dissuaded other districts from pursuing the defendant criminally," even if true, the defendant has failed to show any prejudice.   In fact, if such be true, the defendant surely would have benefited if it had dissuaded the government from prosecuting the defendant in the District of Minnesota.  With no support in the record, the defendant also claims other improper

motives on the part of the Pennsylvania prosecutor which, even if true, would not support a claim that the prosecution in Minnesota is in any way tainted.

The multi-jurisdictional investigation of the defendant's drug trafficking activities established that the defendant's criminal misconduct in Minnesota killed and seriously injured over a dozen victims throughout the United States. This provided ample support and justification for the government's decision to bring charges against him here. It should come as no great surprise to the defendant that it was always the goal of the United States Department of Justice to hold the defendant accountable for each and every crime he committed. That global plea negotiations in Pennsylvania did not accomplish that goal only serves to explain why a more comprehensive and inclusive indictment was returned in Minnesota.[2]

9.   Selective Prosecution Concerning D.L.S. (Claim 11)

The defendant asserts that the government's improper motives are evidenced by its decision to not prosecute D.L.S. for sharing a portion of the fentanyl supplied by the defendant to D.N.M, which caused her death. Def. Br. 22. It is odd that the defendant argues that one of the victims of his own crimes should be prosecuted, while at the same

---

2.   The defendant claims, without any support in the record, that the Minnesota prosecutor improperly threatened to supersede the indictment by adding a charge under 18 U.S.C. § 1716(j)(3). He no doubt relies upon a footnote to the government's original detention motion filed in December 2016 in connection with removal hearings involving the case against the defendant in the Middle District of Pennsylvania. *See United States v. Aaron Rhy Broussard*, Case No. 16-MJ-909 (KMM) (Doc. 4). The government included the same footnote in its more recent detention motion (Doc. 16). It did so in order to emphasize the seriousness of the crimes that the defendant committed. The government ultimately decided to not charge the defendant under that statute and has no intention of superseding the indictment to add the charge.

time argues that he should not be prosecuted for far more serious and extensive criminal misconduct.

### 10.  Speedy Trial (Claims 43-44)

The defendant asks the Court to dismiss the indictment on grounds that his speedy trial rights under the Sixth Amendment have been violated.   The defendant does not claim a speedy trial violation under the Speedy Trial Act (18 U.S.C. § 3161) – and for good reason.   By the government's calculations, not one day of the 70-day speedy trial clock under the statute has elapsed.   This is important because, while Sixth Amendment challenges are reviewed separately from challenges under the Speedy Trial Act, "[i]t would be unusual to find the Sixth Amendment has been violated when the Speedy Trial Act has not."  *United States v. Titlbach*, 339 F.3d 692, 699 (8th Cir. 2003).

The Sixth Amendment right to a speedy trial "attaches at the time of arrest or indictment, whichever comes first, and continues until the trial commences."  *United States v. Erenas-Luna*, 560 F.3d 772, 776 (8th Cir. 2009) (citation omitted).   To determine whether a defendant's Sixth Amendment right to a speedy trial has been violated, the Supreme Court has instructed courts to examine the following four factors:   (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) the prejudice to the defendant.  *See Barker v. Wingo*, 407 U.S. 514, 530 (1972); *United States v. Flores-Lagonas*, 993 F.3d 550 (8th Cir. 2021).[3]

_____

3.   At the time of this response, Westlaw had not yet included page numbers on the online version of the *Flores-Lagonas* opinion.   The government relies on Part II.C.1. of the opinion when citing to the case.

### a.   The Length of the Delay

 "To trigger speedy trial analysis, the defendant must allege the interval between accusation and trial has crossed a line dividing ordinary from presumptively prejudicial delay."   *United States v. Aldaco*, 477 F.3d 1008, 1016. 1019 (8th Cir. 2007) (quotations omitted).   The Eighth Circuit has held that a delay of one year is presumptively prejudicial. *Flores-Lagonas*, 993 F.3d 550.   In this case, 24 months has now passed since the defendant was indicted in the District of Minnesota.   Given the pandemic and the complexity of this case, it will undoubtedly be several more months before the case goes to trial.   As such, this factor admittedly weighs in favor of the defendant.

### b.   The Reason for the Delay

"The second factor involves determining who is responsible for the delay, the defendant or the government."   *United States v. Walker*, 92 F.3d 714, 717 (8th Cir. 1996). The Court must "consider the reasons for the delay and evaluate whether the government or the criminal defendant is more to blame."   *United States v. Mallett*, 751 F.3d 907, 914 (8th Cir. 2014) (quoting *United States v. Summage*, 575 F.3d 864, 876 (8th Cir. 2009)). "There typically will be no Sixth Amendment violation when the defendant 'was responsible for most of the delay, which was occasioned by his motions to suppress evidence, for a competency evaluation, and to dismiss.'"   *Flores-Lagonas*, 993 F.3d 550 (quoting *United States v. Walker*, 840 F.3d 477, 485 (8th Cir. 2016)).   When assessing a delay caused by the government, courts look at the government's justification for the delay.

> A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government.   A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but

nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

*Flores-Lagonas*, 993 F.3d 550 (*quoting* Barker, 407 U.S. at 531) (footnote omitted).

As in *Flores-Lagonas*, the defendant was responsible for most of the delay in this case. In the proceedings in the Middle District of Pennsylvania ("MDPA"), the defendant was first indicted on December 6, 2016. *See United States v. Aaron Broussard*, Case No. 3:16-cr-00352-RDM (M.D. Pa.) (hereinafter "MDPA Case") (Doc. 1.). The case was ultimately dismissed on motion of the government on December 16, 2020. *Id.* (Doc. 125).

The delays from December 6, 2016, through the date of the Minnesota indictment on April 10, 2019, may be relevant in analyzing a speedy trial claim in the MDPA; but, they are not relevant here because the defendant was charged in the MDPA with a separate offense. That being said, most of the delays in the MDPA Case from the time the defendant first appeared there on January 10, 2017, *see* MDPA Case (Doc. 9), until the date of the Minnesota indictment on April 10, 2019, were brought on by a series of unopposed motions by the government for 30-day continuances to enable the parties to continue settlement negotiations and for other stated reasons mutual beneficial to the parties. *See* MDPA Case (Doc. 16, 19, 23, 25, 27, 29, 36, 38, 40, 42, 44, 48, 50, 53, 55, 78). These were followed by a joint motion filed by the government for a 60-day continuance and two motions filed by the defendant for a 150-day continuance. *Id.* (Doc. 78, 81-82). There were also delays associated with the defendant's choice of counsel. Prior to the Minnesota indictment, the defendant had gone through three defense counsel

(one because of a legitimate conflict) and filed several pro se motions.   *Id.* (Doc. 13, 15, 22, 62, 64, 69, 70, 77, 94, 95).

Virtually all of the delays in the MDPA Case after the date of the Minnesota indictment were directly attributable to the defendant.   So, for example, the defendant requested continuances for a total of 380 days in motions filed from April 11, 2019, through February 19, 2020.   *Id.* (Doc. 84, 86, 88, 90, 92).   During these periods of delay the defendant also filed additional pro se motions.   *Id.* (Doc. 97, 100).

Following the unfortunate death of District Judge James J. Munley on March 22, 2020, the Honorable Robert D. Mariani, United States District Judge, was assigned to the case.   *Id.* (Verbal Order dated March 24, 2020).   Judge Mariani quickly set a new trial date for June 24, 2020.   *Id.* (Doc. 98).   He continued the trial to September 21, 2020, because of additional motions filed by the defendant.   *Id.* (Doc. 102, 106).   Then, because of the defendant's continuing problems with counsel, Judge Mariani again continued the trial to November 16, 2020, after granting the defendant's request for new counsel and his appointment of yet another defense counsel for the defendant.   *Id.* (Doc. 112-14).   After the defendant filed yet another pro se motion, the parties jointly requested a final 30-day continuance of the trial in anticipation of the decision by the MDPA to dismiss their case because of a witness issue that relates only to their case.   *Id.* (Doc. 118).   Even then, after Judge Mariani had set a trial date of January 25, 2021, *see id.* (Doc. 119), the defendant filed two more pro se motions.   *Id.* (Doc. 120, 122).   The MDPA Case was dismissed on December 16, 2020, on motion of the government.   *Id.* (124-25).

Immediately after learning of the MDPA's decision to dismiss their case, this district promptly arranged for the transportation of the defendant to Minnesota to commence the current prosecution.   The defendant arrived in Minnesota, was formally arrested on the Minnesota charges, and had his initial appearance on December 1, 2020.   Doc. 13, 15. Since that time, the defendant has requested and been granted several continuances and filing extensions, has fired two defense counsel, and has elected to proceed in the case pro se.   *See* Doc. 19, 30-43.   This has further delayed the case through no fault of the government.   For these reasons, the reason for the delays in this case falls squarely upon the defendant.[4]

### c.   The Defendant's Assertion of His Right To a Speedy Trial

The defendant concedes that that he did not assert his right to a speedy trial at any time prior to the filing of the instant motion.   Def. Br. 54.   In fact, he seemed to show a willingness to prolong the proceedings rather than to conclude them.   For example, he has gone through six defense counsel (having fired four of them) and has filed, or acquiesced in the filing, of numerous continuance and extension motions in both this case and the MDPA Case.   The government is determined to help push this case along and to bring it to a speedy conclusion.   For that reason, unless something extraordinary occurs, the government will not be requesting or consenting to any further continuances or delays in these proceedings.

---

4.   In addition, through no fault of the parties, the pandemic has put a tremendous strain on the Courts and resulted in countless cases being delayed well beyond normal processing times.

d.   Prejudice to the Defendant

Courts assess prejudice "in the light of the interests of defendants which the speedy

trial right was designed to protect." *United States v. Rodriguez-Valencia*, 753 F.3d 801,

806 (8th Cir. 2014) (quotations omitted).   "Promptly bringing defendants to trial prevents

excessive incarceration before trial, with its attendant evils, and avoids harming the

defendant's ability to fairly defend himself due to the potential loss of evidence and

witnesses." *Flores-Lagonas*, 993 F.3d 550 (citing *Barker*, 407 U.S. at 532-33).   The

defendant claims that he has been prejudiced because "the government's reason for delay

was intended to cause oppressive pretrial incarceration and to increase the anxiety and

concern of the defendant."   Def. Br. 55.   Because the defendant has not provided specific

facts in support of his claim of prejudice, the matter must be reviewed as involving

"presumptive prejudice," which the Supreme Court has described as follows:

> [W]e generally have to recognize that excessive delay presumptively
> compromises the reliability of a trial in ways that neither party can prove or,
> for that matter, identify.   While such presumptive prejudice cannot alone
> carry a Sixth Amendment claim without regard to the other *Barker* criteria,
> it is part of the mix of relevant facts, and its importance increases with the
> length of delay.

*Flores-Lagonas*, 993 F.3d 550 (quoting *Doggett v. United States*, 505 U.S. 647, 655–56,

(1992) (citation omitted).   In cases without government negligence, however, the

defendant must show actual or specific prejudice.   *Flores-Lagonas*, 993 F.3d 550 (citing

*Rodriguez-Valencia*, 753 F.3d at 808).

Although the defendant has been in continuous pretrial detention since his arrest on

the Pennsylvania charges on December 6, 2016, he has not demonstrated how that has

prejudiced his case.   Throughout that time, he has either been represented by counsel or declined representation.   As such, he and his defense team has had every opportunity to prepare his defense.   Moreover, only the defendant's incarceration from December 1, 2020 (the date he was arrested for the instant charges), should rightfully be considered in determining prejudice *in this case* based upon pretrial confinement.   Finally, the defendant has not shown any negligence on the part of the government.

This in no way suggests that the government is unsympathetic to the defendant's concerns.   Unfortunately, the MDPA Case clearly affected the timing of the prosecution in this case, but not so much so as to deprive the defendant of his Sixth Amendment right to a speedy trial.   Although the delays in bringing the defendant to justice have, by all accounts, gone far longer than anyone would have wanted or expected, the delays *in this case* (currently 24 months from the time of indictment) are not outside the time-frame of reasonableness.   *Cf. Flores-Lagonas*, 993 F.3d 550 (affirming conviction where nearly four years elapsed between defendant's indictment and his conditional plea of guilty).

### 11.   Outrageous Government Conduct (Claim 46)

The defendant asserts that the prosecution has engaged in outrageous government conduct which, he claims, warrants dismissal of the indictment.   Def. Br. 58.   As the Eighth Circuit has noted:

> Our cases recognize the defense of outrageous government conduct, but only in cases involving the most intolerable government conduct.   Government conduct which is so outrageous and shocking that it exceeds the bounds of fundamental fairness may violate the Due Process clause and bar a subsequent prosecution.   The level of outrageousness needed to prove a due process violation is quite high, and the government's conduct must shock the conscience of the court.

18

*United States v. Hunt*, 171 F.3d 1192, 1195 (8th Cir. 1999) (cleaned up).   In this light, it is quite a stretch for the defendant to claim the government has engaged in outrageous government conduct during the course of these proceedings.   The defendant's "Motion for Dismissal of Indictment by Supervisory Power," *see* Def. Br. 58, is for the same reasons without merit.

   B.   <u>Motion To Suppress Evidence (Doc. 45) (Claims 11-42, 45)</u>[5]

   The defendant has moved to suppress the evidence seized in connection with numerous search warrants and orders issued during the course of this investigation.   He has also moved to suppress the statements he made on December 6, 2016.   All of the defendant's claims can be resolved by a four-corner review of these documents by the Court, which the defendant essentially concedes.   In that vein, the government will offer the pertinent documents at the motions hearing.   As will be explained below, the defendant's motion to suppress his statements is moot.

   1.   <u>E-Mail Warrants (Claims 11-18, 24-25)</u>

   The defendant objects to the evidence obtained by search warrants for records for certain e-mail accounts used by the defendant in connection with his drug trafficking activities.   Def. Br. 32-38, 44-46; Def. Exh. 7-8, 11.   His myriad claims include allegations that the search warrant affidavits are defective in that they did not specifically refer to "controlled substance analogues"; that they did not reference the controlled substance analogue statutes (21 U.S.C. §§ 802(32)(a) and 813); that there was insufficient

_____

   5.   The defendant inadvertently labeled two of his claims as "Claim Eleven."

context to the contents of the affidavits; that they included misleading information; and that there was insufficient evidence to support probable cause for their issuance.

One need only read the affidavits to see that they are detailed and specific and provide overwhelming information to support a finding of probable cause as to each warrant. All of the warrants reference 21 U.S.C. § 841(a)(1), the very statute that the defendant is charged with having committed in the majority of the counts of the indictment. Because distribution of a "controlled substance analogue" is a violation of § 841(a), there was no need for the affiants to reference the definitional provisions of §§ 802(32)(a) and 813. If there is misleading information contained in these affidavits, the defendant has failed to show it. Read in context, the affidavits provided ample support for the issuance of the warrants.

### 2. Title III Authorization (Claims 19-20)

The defendant also moves to suppress the evidence obtained from a Title III interception of his PlantFoodUSA@live.com e-mail account. Def. Br. 38-41; Def. Ex. 9. The sole basis for this claim seems to be that the affidavit in support of the application misrepresented the law and facts of the case. A fair reading of the affidavit belies this claim. The 43-page affidavit is thorough, inclusive and accurate and goes far beyond providing probable cause to support the application.

### 3. Hopkins Warrant (Claims 21-23)

The defendant next claims that the search warrant for his apartment in Hopkins, Minnesota, was defective. Def. Br. 41-44; Def. Exh. 10. He argues that the search warrant affidavit "fail[ed] to provide context that would influence an inference that the

20

government's target intended these alleged substances to be consumed by humans," "recklessly failed to add context of whether the alleged distribution of fentanyl was committed intentionally," and was overbroad. *Id.* Again, a fair reading of the affidavit belies these claims.

### 4. Click-N-Ship Records (Claim 26)

The defendant claims that various "Click-N-Ship" records in the possession of the government and provided to the defense in discovery should be suppressed. Def. Br. 46-47. These records are United States Postal Service business records available to all United States Postal Inspectors. As such, neither a warrant nor a subpoena was required to access them.

### 5. Priority Mail Warrants (Claims 27-35)

During the course of the investigation, the government obtained warrants for several United States Postal Service priority mail envelopes. The defendant claims that these warrants were defective for reasons similar to those discussed above. Def. Br. 47-50; Def. Exh. 12-14. Again, a fair reading of the search warrant affidavits belies the defendant's claims.

### 6. Latitude and Longitude Warrant (Claims 37-38)

The government also obtained a warrant authorizing the interception of latitude and longitude data concerning the defendant's cellular telephone. Def. Br. 52; Def. Exh. 15. The defendant claims that this warrant was defective for reasons similar to those discussed above. This claim fails for the reasons previously discussed.

7. <u>Buccal DNA Warrant (Claims 39-42)</u>

The defendant has moved to suppress the evidence obtained from a warrant authorizing the collection of his buccal DNA.   Def. Br. 52-53; Def. Exh. 16.   The defendant advances no sound reason for the suppression of this evidence.

8. <u>Defendant's Statement (Claim 45)</u>

Finally, the defendant has moved to suppress the statement he made on December 6, 2016.  Def. Br. 56-57.  The government does not intend to offer this statement in its case-in-chief, but reserves the right to offer it in rebuttal.   This motion is, therefore, moot.

C.   <u>Motion To Retain Rough Notes (Doc. 46)</u>

The government has instructed its agents to retain their rough notes concerning this investigation.

D.   <u>Motion for Discovery for Change [sic] of Custody Material (Doc. 47) (Def. Br. 59-60)</u>

The defendant has requested all chain-of-custody materials concerning the investigation.   The government has endeavored to provide the defendant will all such materials and will continue to do so pursuant to its discovery obligations.

E.   <u>Motion To Compel Discovery (Doc. 48) (Def. Br. 23-25, 29-32)</u>

The government has and will continue to comply with all of its discovery obligations under the Federal Rules of Criminal Procedure and applicable case law.   The defendant provides a litany of discovery requests, many of which fall under the category of requests for attorney work product materials.   *See* Def. Br. 24-25.   The government asks the Court to deny this overbroad discovery request.   To the extent that any of the requested materials

fall under the government's duty to provide *Brady*, *Giglio* or Jencks Acts materials, the government will timely disclose such materials to the defendant. The government will timely comply with Fed. R. Crim. P. 16 and requests the Court to direct that the government to provide notice to the defendant of its experts and Fed. R. Evid. 404(b) materials at least three weeks prior to trial.

F.   Motion for Release of Brady Materials and Giglio Materials (Doc. 49) (Def. Br. 25-29)

The government will fully comply with its discovery obligations under *Brady* and *Giglio* and will disclose any impeaching information and any evidence favorable to the defense. As to the government's so-called "rogue cop/agent," *see* Def. Br. 26, the government does not intend to call this officer at trial.[6]

G.   Motion for Disclosure of Grand Jury Minutes (Doc. 50) (Def. Br. 16-17, 60)

The government objects to this motion for the reason outlined in Part II.A.2., above.

H.   Motion for a Bill of Particulars (ECF 51) (Def. Br. 60)

The purpose of a bill of particulars is to inform a defendant of the nature of the charges against him and to prevent or minimize the element of surprise at trial. *United States v. Beasley*, 688 F.3d 523, 532 (8th Cir. 2012). A bill of particulars is not intended to provide a defendant with evidentiary detail or discovery regarding the government's case. *United States v. Hester*, 917 F.2d 1083, 1084 (8th Cir. 1990). Rather, it is required only when necessary to inform a defendant of the charges against him with sufficient clarity

---

6. The government has no evidence to suggest that this officer's involvement in the case prejudiced the defendant or led to the wrongful collection of any evidence.

to enable him to prepare his defense, to minimize the element of surprise at trial, and to enable him to protect himself against a second prosecution for an inadequately described offense.  *United States v. Stephenson,* 924 F.2d 753, 762 (8th Cir. 1991).

Count 1 of the indictment charges the defendant with a drug conspiracy which sets forth the ways, manners and means the defendant and others used to carry out the objects of the conspiracy.   It also lists numerous overt acts of the conspiracy, which mirror the 20 substantive counts of the indictment.   The indictment fully complies with Fed. R. Crim. P. 7(c)(1) in that it contains a "plain, concise, and definite written statement of the essential facts constituting the offense[s] charged."   Moreover, the defendant has been provided with open discovery.   As such, the defendant has failed to show the need for a bill of particulars.  *See United States v. Livingstone*, 576 F.3d 881, 883 (8th Cir. 2009) (holding that the indictment and disclosures obviated the need for a bill of particulars).

### III.   Conclusion

WHEREFORE, the government asks this Honorable Court to enter an Order consistent with the government's responses.

Dated:   April 28, 2021                          Respectfully submitted,

                                                 W. ANDERS FOLK
                                                 Acting United States Attorney

                                                 s/ *Thomas M. Hollenhorst*

                                                 BY: THOMAS M. HOLLENHORST
                                                 Assistant United States Attorney
                                                 Attorney ID No. 46322