UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

United States of America,

              Plaintiff,

v.

Aaron Rhy Broussard,

              Defendant.

Case No. 0:19-cr-101 (SRN/KMM)

**REPORT AND
RECOMMENDATION**

---

      This matter is before the Court for a Report and Recommendation on Defendant Aaron

Broussard's Motions to Dismiss the Indictment and Motions to Suppress. [ECF Nos. 5, 6, 9, 44-

51].[1] Mr. Broussard has been charged by Indictment with 21 counts related to importation,

possession, and distribution of controlled substances. Specifically, Mr. Broussard is charged with

one count of Conspiracy; one count of Importation of Fentanyl; seven counts of Possession with

Intent to Distribute various controlled substances or controlled substance analogues; nine counts

of Distribution of Fentanyl Resulting in Death; two counts of Distribution of Fentanyl Resulting

in Serious Bodily Injury; and one count of Distribution of Fentanyl Resulting in Serious Bodily

Injury and Death. [Indictment 1–16, ECF No. 1].

      Mr. Broussard has filed numerous pretrial motions since his indictment, and the Court

held a motion hearing on May 10, 2021. [Minutes, ECF No. 58]. Because he is pro se, Mr.

---

[1] Since his indictment, Mr. Broussard has filed four substantive pretrial motions related to the
indictment, the last of which is actually a 61-page brief that addresses many issues. [ECF Nos. 5,
6, 9, 44]. The clerk of court interpreted this lengthy filing as raising several motions, and
therefore docketed it with separate captions eight times, at ECF 44–51. In ECF 44, Mr.
Broussard states, "This document is essentially an amended version of the former filings of the
same" and the Court's review supports that assertion. Accordingly, the Court will refer primarily
to ECF 44 in this R&R.

Broussard's motions are organized somewhat differently from those ordinarily seen in our District. The Court has endeavored to organize Mr. Broussard's submissions and analysis into workable arguments.[2]

Mr. Broussard seeks dismissal of the charges against him on several independent grounds: grand jury misconduct through the presentation of a flawed theory of prosecution and a misstatement of the law; grand jury misconduct through the refusal to present exculpatory evidence; vindictive prosecution; and selective prosecution. Mr. Broussard also seeks suppression of evidence seized during the course of the investigation pursuant to search warrants and tracking warrants, and bases these requests on several grounds: that the warrant applications failed to establish probable cause, using a traditional "four corners" challenge; that the theory of illegality underpinning each of the warrant or tracking applications suffered from the same legal flaws as the Indictment itself; and that the warrant applications contained false or misleading statements. Additionally, Mr. Broussard argues that the charges against him must be dismissed because his constitutional right to a speedy trial has been violated by the pretrial delay in this case.[3] The Court will begin by analyzing the Motions to Dismiss the Indictment, followed by the Motions to Suppress, and will conclude with a discussion of the speedy trial claims.

_____

[2] The Court reads Mr. Broussard's filings in a manner that endeavors to address each motion and argument, regardless of the organization of his submissions. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed pro se is 'to be liberally construed' . . . .") (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)); *United States v. Sellner*, 773 F.3d 927, 932 (8th Cir. 2014) (applying the Erickson liberal-construction rule to a pro se defendant's post-judgment 2255 motion); *United States v. Dickerson*, No. CR419-072, 2020 WL 7234516 (S.D. Ga. Sept. 9, 2020) (giving liberal construction to criminal defendant's pro se motion to reconsider her detention pending sentencing).

[3] Mr. Broussard also moved to suppress a statement that he made, alleging that it was given without the required *Miranda* warnings. However, at the hearing on these motions, the government proffered that it would not use the statements in its case in chief, and Mr. Broussard

After careful analysis of all of Mr. Broussard's filings, the Court recommends denial of each one of the motions to dismiss and suppress.[4]

## I.    OVERVIEW OF THE GOVERNMENT'S ALLEGATIONS

The Minnesota Indictment alleges that Mr. Broussard conspired with others, and imported, possessed, and distributed various controlled substances and controlled substance analogues. [Indictment, ECF No. 1]. Specifically, the Indictment asserts that over a period of several years, Mr. Broussard purchased a variety of substances from China-based suppliers, including numerous different controlled substance analogues that were intended for human consumption. He would then repackage those substances, market them for sale on websites—including PlantFoodUSA.Net—and send the substances to purchasers across the country using the mail. [Indictment, ECF No. 1]. Most seriously, the Indictment asserts that in March 2016, Mr. Broussard ordered 100 grams of 4-FA from his source in China, but instead received 100 grams of fentanyl. He then distributed that fentanyl to customers around the country, resulting in up to eleven overdose deaths and serious injury to four others.[5]

## II.    RELEVANT PROCEDURAL BACKGROUND

On December 6, 2016, a grand jury in Scranton, Pennsylvania, returned a one-count Indictment against Mr. Broussard, charging him with distribution and possession with intent to distribute a controlled substance resulting in serious bodily injury and death in violation of 21

---

withdrew that challenge. [Hr. Min., ECF No. 58]. If the government changes its position, Mr. Broussard can refile his motion to suppress this statement at a later date.

[4] Mr. Broussard has also filed motions seeking discovery and a bill of particulars. These are dealt with in a separate order.

[5] Count one of the Indictment, the conspiracy count, lists eleven people who died and four who were seriously injured. However, the subsequent individual counts of the Indictment only bring specific charges of distribution resulting in death as to ten people and distribution resulting in serious bodily injury as to three others.

U.S.C. §§ 841(a)(1) and 841(b)(1)(C). *United States v. Broussard*, 3:16-cr-352 (RDM) (M.D. Pa.) (Indictment, ECF No. 1). The Indictment followed a multi-jurisdiction investigation into a cluster of fentanyl overdoses in various locations across the United States. *United States. v. Broussard*, 3:16-cr-352, 2020 WL 3839643, at *1 (M.D. Pa. July 8, 2020).[6] Specifically, investigators discovered that the victims had, shortly before their overdoses, purchased various compounds purported to be controlled substance analogues from a website with the domain name, "PLANTFOODUSA.NET." *Id.* The grand jury returned the Indictment after two individuals in the Middle District of Pennsylvania allegedly overdosed on these substances, and investigators collected evidence that the operation was being orchestrated by Mr. Broussard from his home in Hopkins, Minnesota. *Id.*

Mr. Broussard was arrested on the same day the Pennsylvania Indictment was returned, and after an initial appearance, detention, and removal hearing, the Court granted the government's motion for detention. *United States v. Broussard*, 16-mj-909 (KMM) (D. Minn.) (ECF Nos. 2–6). On December 17, 2016, the Court ordered Mr. Broussard removed to the Middle District of Pennsylvania. *Id.* (ECF No. 9).

The Indictment[7] against Mr. Broussard in the Middle District of Pennsylvania was pending for four years. During that time, "[a]lthough Defendant's counsel engaged in plea

---

[6] Portions of this procedural history are drawn from a July 8, 2020, Order issued by the District Court in the Middle District of Pennsylvania denying Mr. Broussard's motion to transfer the pending Pennsylvania case to the District of Minnesota. *United States. v. Broussard*, 3:16-cr-352, 2020 WL 3839643, at *1 (M.D. Pa. July 8, 2020) (hereinafter "M.D. Pa. Venue Order at 1").

[7] The indictment was superseded by another on November 20, 2018, which retained the same single count, but added a second overdose victim. *United States v. Broussard*, 3:16-cr-352 (RDM) (M.D. Pa.) (Superseding Indictment, ECF No. 57); *United States v. Broussard*, 3:16-cr-352, 2020 WL 3839643, at *1 (M.D. Pa. July 8, 2020).

negotiations that would include the charges brough in the Middle District of Pennsylvania, as well as open investigations in approximately thirteen (13) other jurisdictions, the parties were unable to reach an agreement." Also during the pendency of the Pennsylvania charges, the government filed 15 motions to continue described as "unopposed." *United States v. Broussard*, 3:16-cr-352 (RDM) (M.D. Pa.) (Unopposed Mots. to Continue, ECF Nos. 16, 18, 23, 25, 27, 29, 36, 38, 40, 42, 44, 48, 50, 53, 55; *see also* Oral Mot. to Continue, ECF No. 46; Joint Mot. to Continue, ECF No. 118). As for Mr. Broussard, he was appointed four different attorneys, for various reasons (ECF Nos. 11, 15, 62, 114); filed seven motions to continue (ECF Nos. 81, 82, 84, 86, 88, 90, 92); filed a number of pretrial motions (ECF Nos. 30, 64, 94, 97, 100, 116, 120, 123); and also filed a petition for a writ of habeas corpus. *United States v. Broussard*, 3:16-cr-352 (RDM) (M.D. Pa.); *Broussard v. United States*, 1:20-cv-2180, 2020 WL 8087921 (M.D. Pa. Nov. 23, 2020) (habeas corpus petition).

On April 10, 2019, a grand jury in the District of Minnesota returned an Indictment against Mr. Broussard, charging him with 21 counts, as summarized above. [ECF No. 1]. The Court appointed counsel to Mr. Broussard on September 19, 2019, although he remained in Pennsylvania at that time. Ultimately, the Pennsylvania indictment was dismissed on motion of the government on December 16, 2020. *United States v. Broussard*, 3:16-cr-352 (RDM) (M.D. Pa.) (Order, ECF No. 125). Upon learning that the Pennsylvania charges were going to be dismissed, the government here initiated the transfer of Mr. Broussard to the District of Minnesota, where he made his initial appearance on December 1, 2020, and held a detention hearing on December 11, 2020. On February 10, 2021, the Court held a hearing pursuant to *Faretta v. California* and granted Mr. Broussard's motion to proceed pro se. 422 U.S. 806

(1975). All told, Mr. Broussard has filed twelve pretrial motions[8] since his indictment, and the Court held a pretrial motion hearing on May 10, 2021. [Minutes, ECF No. 58].

## III.    ANALYSIS

### A.  The Controlled Substance Act, the Analogue Act, *McFadden*, and Criminal Intent

Many of the separate challenges Mr. Broussard levels at his Indictment and at the searches conducted in his case rely upon a single overarching argument: that the charges in the Indictment rely on a theory of guilt that is fundamentally flawed. In essence, he argues that the government will be unable to prove the requisite criminal intent under the Controlled Substances Act (CSA), 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), because there is no evidence that he intended to distribute a controlled substance. Although the Indictment alleges and the government advances a theory that, at a minimum, he intended to distribute a "controlled substance analogue," as contemplated by the Controlled Substances Analogue Act (AA), 21 U.S.C. § 813, Mr. Broussard argues that such knowledge is insufficient to sustain the degree of criminal intent required under § 841. Because it is the underpinning of many of Mr. Broussard's other challenges, the Court will address this legal theory first.

Contrary to Mr. Broussard's analysis, the Indictment against him is not fatally flawed. Indeed, Mr. Broussard's argument relies on two premises, neither of which carry the day. First, he alleges that the government will be unable to prove that he knowingly distributed fentanyl, which resulted in the deaths of his customers, arguing that at most the government might be able to prove that he knowingly distributed 4-FA, an amphetamine analogue. Second, he says that his

---

[8] Mr. Broussard has filed four motions to dismiss the indictment. [ECF Nos. 5, 6, 9, 44]. But the last filing actually contains eight separate motions. In this 61-page brief, in which he states, "This document is essentially an amended version of the former filings of the same." [ECF Nos. 44–51]. Accordingly, the Court will refer primarily to his lengthy filing at ECF 44, although it has carefully reviewed his other submissions as well

alleged intent to distribute 4-FA is insufficient to support convictions under the CSA, which require intentional distribution of a controlled substance – because an analogue is not a controlled substance under the CSA, intent to distribute an analogue is not enough to sustain a conviction under that Act. But each of these arguments fails.

**Criminal Intent Under the Controlled Substances Act**

Section 841(a) of the CSA requires the government to prove beyond a reasonable doubt that (1) a defendant distributed the specific controlled substance identified in the Indictment; and (2) that the defendant knew that he was distributing a controlled substance. *See, e.g.*, *United States v. Ramos*, 814 F.3d 910, 915 (8th Cir. 2016). Because "knowingly" in the statute refers to a "general criminal intent," the government must only prove that the defendant knew that the substance at issue was a controlled substance of some kind, but not necessarily which particular type of controlled substance it was. *Id*. at 915 (quoting *United States v. Noibi*, 780 F.2d 1419, 1421 (8th Cir. 1986)); *see also McFadden v. United States*, 576 U.S. 186, 191–92 (2015) (noting that the CSA's knowledge requirement "may be met by showing that the defendant knew he possessed a substance listed on the schedules, even if he did not know which substance it was.") "Controlled substance" as contemplated by the CSA includes any drug or other substance listed in the enumerated drug schedules. 21 U.S.C. § 802(6). It is settled, for example, that a person can be guilty of distributing methamphetamine, a controlled substance, even if they believed they were distributing cocaine, also a controlled substance. And here, fentanyl, the substance which Mr. Broussard is accused of actually distributing in the most serious counts of the Indictment, is a controlled substance within the meaning of the CSA. *See* § 802(c), schedule II (b)(6).

**Criminal Intent Under the Analogue Act**

The Analogue Act targets drugs that are not listed on the schedules. Specifically, the AA "identifies a category of substances substantially similar to those listed on the federal controlled substance schedules, 21 U.S.C. § 802(32)(A), and then instructs courts to treat those analogues, if intended for human consumption, as controlled substances listed on schedule I for purposes of federal law, § 813." *McFadden*, 576 U.S. at 188. The statute itself says that, if intended for human consumption, the analogue is treated as a controlled substance "for the purposes of *any* Federal law." 21 U.S.C. § 813 (emphasis added). To convict someone of a crime under the CSA, where the controlled substance at issue is not listed on any schedule directly but is instead an analogue, the government must prove either that the defendant knew that the substance was controlled under the CSA or the Analogue Act, even if he did not know its identity, or that the defendant knew the specific features of the substance that make it an analogue. *McFadden*, 576 U.S. at 188–89. The government alleges that 4-FA is an analogue of amphetamine under the meaning of the AA, with a molecular structure that differs from amphetamine by a single atom.[9]

**The Government's Theories of the Case**

The government argues that it has three theories of proving Mr. Broussard's guilt, both of which are contemplated by the Indictment. [Gov. Br. 3–4, ECF No. 55]. First, the government alleges that Mr. Broussard knowingly distributed fentanyl to his customers, resulting in their deaths. Although it acknowledges that it might not be able to prove that Mr. Broussard was aware that he was distributing fentanyl at the time of some or all of the transactions, it had probable cause to support this allegation when it sought the Indictment, and it reserves the right

---

[9] The government will have to prove at trial that 4-FA is in fact an analogue, as well as proving the required degree of intent as set forth in *McFadden*. But the question at this stage is not whether the government can meet that burden of proof, but whether the allegations in the Indictment, if proven constitute the crimes alleged. *United States v. Mohr*, 728 F.2d 1132, 1134 (8th Cir. 1984) ("[T]he indictment is valid if sufficient allegations remain to charge a crime.").

to attempt to prove this direct theory intent at trial. The government suggests that it could also prove this degree of intent by offering evidence of and seeking a jury instruction regarding Mr. Broussard's willful blindness. Alternatively, the government asserts that it will prove that Mr. Broussard, at a minimum, believed he was distributing 4-FA to his customers, and therefore had the degree of intent required by the AA and *McFadden*. According to the government, this means that he was guilty as charged of the CSA offenses set forth in the Indictment.

**Mr. Broussard's Theory**

Mr. Broussard asserts that, at most, the government can prove that he accidentally distributed fentanyl. Because the government's evidence points to probable cause that he believed he was in fact distributing 4-FA—not a controlled substance but an analogue for a controlled substance—he argues that he cannot have had the requisite intent required for the CSA violations set forth in the Indictment. (ECF 44, at 4). Mr. Broussard argues that the only way the government can have obtained an Indictment alleging the violations of the CSA is by mischaracterizing the law on intent or by concealing evidence that he thought he was distributing fentanyl.

**A Flawed Analysis**

Unfortunately for Mr. Broussard, this argument—the umbrella theory behind many of his specific motions—is simply incorrect. A person *can* be guilty of a controlled substance crime under the CSA even if they believed they were distributing an analogue rather than a listed drug. Indeed, the AA specifically provides that the analogue is treated as a controlled substance for the purposes of "any" federal law, obviously including the CSA. So, as the Court in *McFadden* itself made clear, the CSA's requirement that a defendant knowingly distribute a controlled substance is satisfied if that person knowingly distributes an analogue to a listed substance. *McFadden*, 576

U.S. at 188–89; *see also United States v. Benjamin*, 958 F.3d 1124 (11th Cir. 2020) (affirming a conviction under 21 U.S.C. 841(a)(1) and (b)(1)(C) for distribution of an analogue resulting in death). Simply put, a person can be guilty if they had the requisite intent to distribute an analogue but inadvertently distributed an actual controlled substance in the same way that a defendant can be guilty of distribution of a controlled substance when they believed they were distributing a different controlled substance.

The Eighth Circuit recently addressed an argument not unlike the one Mr. Broussard raises here, though in the context of reviewing a motion to withdraw a guilty plea rather than a pretrial challenge to an Indictment. In *United States v. Sharp*, 879 F.3d 327, 337 (8th Cir. 2018), the court rejected the defendant's argument that he could not be guilty of an offense under the CSA, even if he did distribute a substance listed on a schedule, if he believed the substance he was distributing was merely an analogue.

> [T]he Government needs to establish only general criminal intent to obtain a conviction under § 841(a). As we have explained, "The Government is not required to prove that the defendant actually knew the exact nature of the substance that the defendant actually knew the exact nature of the substance with which he was dealing. The 'knowingly' element of the offense refers to a general criminal intent, *i.e.* awareness that the substance possessed was a controlled substance of some kind." *In other words, when the Government proves beyond a reasonable doubt that a defendant believed that a substance was an analogue intended for human consumption, that defendant cannot escape liability because the substance turned out to have been on the controlled substance schedule.* The belief that he possessed an analogue establishes the defendant's knowledge.

*United States v. Sharp*, 879 F.3d at 337 (quoting *United States v. Ramos*, 814 F.3d 910, 915 (8th Cir. 2016)) (emphasis added).

Not only does Mr. Broussard's argument disregard this controlling authority, but the statutory interpretation for which he advocates makes little sense. Under Mr. Broussard's argument, a person could be convicted of distribution of a controlled substance analogue

resulting in death under §§ 841(a)(1) and (b)(1)C) if they knowingly distributed an analogue but not if they thought they were distributing an analogue but were actually distributing an arguably more serious substance directly criminalized by the CSA. This interpretation, which would provide a harsher penalty for the knowing distribution of a less serious substance than for "accidental" distribution of a more serious substance in the guise of an analogue, is not plausible as a policy matter.

In sum, the Court rejects Mr. Broussard's fundamental challenge to the Indictment in his case. The Indictment accurately sets forth several offenses under the AA and the CSA, read together, and it correctly describes the elements of those offenses.[10] Of course, the government must still prove each of the required elements beyond a reasonable doubt at trial in order for Mr. Broussard to be convicted. Among other things, this will require proving a causal link between the drug allegedly distributed by Mr. Broussard and the deaths and injuries alleged in the Indictment, as contemplated by *Burrage v. United States*, 571 U.S. 204 (2014). It will also require proving the degree of intent required by *McFadden* and its Eighth Circuit progeny. But the Court concludes that the Indictment itself is not fatally flawed as Mr. Broussard alleges.

### B. Motions to Dismiss the Indictment

Mr. Broussard argues that the Indictment should be dismissed in light of what he contends are several instances of prosecutorial misconduct before the grand jury resulting in violations of his due-process rights, as well as for other due-process violations wrought by government misconduct throughout the history of this and related proceedings. The government

---

[10] Mr. Broussard alleges that the Indictment fails to spell out the elements of the charges against him. But each count of the Indictment correctly articulates the offenses alleged, and the Court finds no merit to his challenge on this point.

asserts that there has been no improper conduct on its part at any stage of the relevant proceedings, and that the motions to dismiss should therefore be denied.

### 1. Misconduct Before the Grand Jury

The Court now turns to the challenges Mr. Broussard raises to the government's conduct before the grand jury. The Court concludes that Mr. Broussard fails to establish any misconduct or legal error, and recommends that his motion to dismiss on this basis be denied.

**Establishing Government Misconduct Before the Grand Jury**

At the outset, it is important to note that challenges to the work of a grand jury and its decision to issue an Indictment are disfavored and defendants raising such arguments have an uphill climb to success. "[G]rand jury proceedings are afforded a strong presumption of regularity, and a defendant seeking to overcome that presumption faces a heavy burden." *United States v. Fenner*, 600 F.3d 1014, 1021 (8th Cir. 2010) (quoting *United States v. Hintzman*, 806 F.2d 840, 843 (8th Cir. 1986)). Not only must a defendant challenging grand jury proceedings make a robust showing in order to get relief, but dismissal is an extreme remedy and inappropriate absent a showing of actual prejudice to a defendant. *Id.* at 1021 (quoting *United States v. Wilson*, 565 F.3d 1059, 1069–70 (8th Cir. 1986)).

Against this backdrop, Mr. Broussard's challenges to the grand jury proceedings in his case and the resulting Indictment must fail.

**Failure to Present Exculpatory Evidence**

Mr. Broussard first alleges that "the government has withheld exculpatory alleged evidence solely to achieve probable cause for multiple counts." [ECF No. 44 at 2]. He points to evidence in the discovery provided to him by the government suggesting that he believed the products he distributed were 4-FA rather than fentanyl. Because such evidence is clearly

exculpatory, according to Mr. Broussard, the failure to present it to the grand jury constituted serious prosecutorial misconduct.

There are three critical flaws with Mr. Broussard's argument on this point.[11] First, as he concedes, there is no requirement for a prosecutor to present exculpatory evidence to a grand jury. *United States v. Williams*, 504 U.S. 36 (1992) (exploring the historical role of the grand jury as "assess[ing] whether there is adequate basis for bringing a criminal charge" and rejecting an argument that the Fifth Amendment requires inclusion of exculpatory evidence); *U.S. v. Darden*, 688 F.3d 382, 387 (8th Cir. 2012) ("The government is not obligated to present exculpatory evidence in grand jury proceedings, since the grand jury sits not to determine guilt or innocence, but to assess whether there is adequate basis for bringing a criminal charge."). Mr. Broussard points to no authority for an exception to this rule when, as he asserts, "the exculpatory alleged evidence is *extremely* substantial and may reasonably be expected to lead a grand jury not to return such counts" [ECF No. 44 at 2], and the Court's review of the relevant caselaw finds no support for such an exception. Instead, the law contemplates that a defendant may present any exculpatory evidence he wishes to the jury at a trial; if he is correct that such evidence prevents the government from being able to prove guilt beyond a reasonable doubt, he will be acquitted. But the government's decision not to present such evidence to the grand jury at the inception of the case does not require dismissal.

---

[11]  In addition, Mr. Broussard's challenges to the government's conduct before the grand jury suffer from an additional defect: that he speculates and surmises about what the government *must have done* rather than offering actual evidence or support for his claims. It is unlikely that such proffered beliefs could satisfy the high burden required for a challenge to grand jury proceedings. However, because Mr. Broussard lacks access to the grand jury transcripts at this stage and the proceedings are otherwise secret, the Court grants some latitude to his inability to offer concrete proof. And even if the government proffered the evidence or provided the legal instructions to the grand jury that he surmises, doing so would still not constitute error, let alone cause the sort of prejudice to support a motion to dismiss the Indictment.

Second, although Mr. Broussard tries to reframe the alleged preclusion of this exculpatory evidence from the grand jury proceedings as one of prosecutorial misconduct rather than omission of exculpatory evidence—seemingly in an effort to avoid the holding in *Williams*—that effort does not succeed. The case upon which he relies, *United States v. Restrepo*, 547 Fed. Appx. 34, 44 (2d Cir. 2013), rejects a challenge to the government's reliance on hearsay evidence before the grand jury. The *Restrepo* court found no misconduct where the government properly apprised the grand jury regarding both the nature of its hearsay evidence and their authority to seek additional direct testimony. That decision simply does not support an argument that, when exculpatory evidence is significant, its omission from the grand jury process requires dismissal. And even if Mr. Broussard could properly frame the decision not to present exculpatory evidence as misconduct despite *Williams*, his effort to do so here cannot succeed because he offers no evidence of gross or purposeful deception by the government. *See, e.g.*, *United States v. Roach*, 28 F.3d 729, 739 (8th Cir. 1994) (observing that an Indictment is not subject to challenge on the ground that it acted "on the basis of inadequate or incompetent evidence"); *see also United States v. Darden*, 688 F.3d 382, 387 (8th Cir. 2012) (observing that where defendant alleges prosecutorial misconduct, dismissal of the indictment is "proper only when the defendant demonstrates flagrant misconduct and substantial prejudice.") (quoting *United States v. Wadlington*, 233 F.3d 1067, 1074 (8th Cir. 2000)).

Third, Mr. Broussard's argument regarding exculpatory evidence relies on the fundamental misinterpretation of the criminal statutes already addressed by the Court in section III above. As explored in detail, even if the evidence established conclusively that Mr. Broussard believed he was distributing 4-FA instead of fentanyl, such evidence would be sufficient to prove that he "knowingly" distributed a controlled substance, as required by the CSA provisions he is

accused of violating. Therefore, the government's omission of evidence from the grand jury that supports such a theory would not have undermined the finding of probable cause to support the offenses set out in the Indictment.

For these reasons, the Court concludes that the government's purported omission of exculpatory evidence from its presentation to the grand jury was not error, and does not require dismissal of the Indictment.

**Misrepresentations of the Law to the Grand Jury**

Mr. Broussard's second challenge regarding the grand jury proceedings alleges that the government incorrectly instructed the jurors regarding the applicable legal standards. [ECF Nos. 4–6, 13]. Mr. Broussard claims that the grand jury must have been incorrectly instructed about the controlling law because, if they had been properly instructed about the "accidental distribution of a controlled substance" theory, it would have been "technically impossible" for them to charge him with CSA offenses. Again, however, this argument relies upon Mr. Broussard's flawed reading of the statutes under which he is charged. *See* section III, *supra*; *United States v. Sharp*, 879 F.3d 327, 337 (8th Cir. 2018) ("Under federal law, analogues are themselves treated as controlled substances."). To the extent that Mr. Broussard is challenging whether the government can prove that he had the requisite level of intent required by *McFadden* for knowing distribution of an analogue drug, that is a question for trial rather than a basis on which to challenge the Indictment.

Mr. Broussard also challenges the government's alleged presentation of the theory of willful blindness to the grand jury, arguing that it is at odds with allegations of knowledge. [ECF Nos 44 at 14–15]. This argument is, likewise, unavailing. First, it is entirely unclear whether the government mentioned willful blindness to the grand jury or not, but neither its inclusion nor its

omission would be error in this case. Certainly, willful blindness is often not spelled out in a grand jury Indictment; instead, the government seeks a jury instruction on willful blindness at trial, as the doctrine provides a means of proving the requisite degree of intent for many criminal statutes, including the CSA. *See, e.g.*, *United States v. Mellor*, 373 Fed. Appx. 656 (8th Cir. 2010) (rejecting argument that a willful-blindness jury instruction constructively amended the indictment because "instruction merely provided a means of inferring that knowledge"); *United States v. Sharp*, 879 F.3d 327 (8th Cir. 2018) (holding that evidence that "there was a high probability that [the defendant believed] the substance was an analogue is sufficient for establishing willful blindness," because "the government needs to establish only general criminal intent to obtain a conviction under Section 841(a)").

Additionally, even if the concept of willful blindness was included in the presentation to the grand jury, there is nothing wrong with the government articulating different theories by which they can prove their case. It is not improper for the government to attempt to prove Mr. Broussard's knowledge either directly, through proving that he knowingly distributed an analogue controlled substance, or through willful blindness. *United States v. Platter*, 514 F.3d 782, 787 (8th Cir. 2008) ("Generally, the government is free to prove a defendant's liability for one criminal offense using multiple theories of guilt."). And an indictment does not have to make clear which theory of liability the government will use to prove a particular element—here the element of intent. *United States v. Zackery*, 494 F.3d 644, 649 (8th Cir. 2007) ("An indictment need not plead the government's theory of liability."). For these reasons, even if Mr. Broussard could establish that the government instructed the grand jury that they could charge him with drug offenses if they found him to be willfully blind to the risk that the drug he was distributing was fentanyl, that would not have been misconduct.

### 2. Vindictive Prosecution

Mr. Broussard asserts that the government has handled his prosecution in a vindictive and unlawful way in two respects. He specifically argues that alleged coordination between districts, including the District of Minnesota and the Middle District of Pennsylvania, was improper because the prosecutors in those districts were aware that Mr. Broussard did not know that the substance he sold was fentanyl and therefore the charged "federal crime was never allegedly committed." [ECF No. 44 at 18]. In essence, he asserts that the multiple districts, led by the prosecutor in Pennsylvania, coordinated their investigations and prosecutions in an effort to convict him of offenses he did not commit. He also asserts that the United States Attorney's Office in the District of Minnesota brought the Indictment against him to punish him for pursuing pretrial litigation in the Pennsylvania case rather than simply pleading guilty as part of a global resolution of all federal charges against him. For several reasons, these claims fail.

### Coordination Between Districts

Mr. Broussard's challenge to the coordination between United States Attorney's Offices in multiple districts lacks merit. As explored above, even if the government actors in every district shared Mr. Broussard's belief that they cannot prove he knew the drug he allegedly distributed was fentanyl, he can nonetheless be prosecuted under the CSA. There can be no coordinated effort to seek unsupported charges against him because the charges themselves withstand careful scrutiny. Second, there is nothing wrong with multiple districts coordinating their investigation and prosecution of a defendant in an effort to share information, prevent redundancy, conserve resources, or avoid unjust results. *See United States v. Elmardoudi*, 501 F.3d 935 (8th Cir. 2007) (affirming conviction where multiple districts coordinated efforts and attempted to reach "global resolution"); *United States v. Lucas*, 841 F.3d 796, 804 (8th Cir.

2016) (noting that, with respect to state/federal efforts, caselaw "permits very close coordination in the prosecutions, in the employment of agents of one sovereign to help the other sovereign in its prosecution, and in the timing of the court proceedings so that the maximum assistance is mutually rendered by the sovereigns"). Mr. Broussard cites to no authority that such coordination is forbidden, and the Court is aware of none. And his allegation that the Pennsylvania prosecutor discouraged other districts from charging him if a global resolution could be achieved suggests that the coordination would have been in his interest, rather than detrimental to him.

**Punishment for Not Pleading Guilty**

Mr. Broussard's argument that the Minnesota Indictment against him is retribution for refusing to plead guilty in Pennsylvania also fails. Vindictive prosecution occurs when "a prosecutor seeks to punish a defendant solely for exercising a valid legal right." *United States v. Williams*, 793 F.3d 957, 963 (8th Cir. 2015). A defendant bears a "heavy burden to show that [a] prosecution was vindictive, in light of the discretion prosecutors are given in performing their duties." *United States v. Robinson*, 809 F.3d 991, 1000 (8th Cir. 2016) (declining to presume vindictiveness, despite the government's decision to add charges after a defendant went to trial and was granted a mistrial for a deadlocked jury).

As an initial matter, the Supreme Court has held that charging a defendant with a more serious charge after that defendant declines to plead guilty to a lesser offense is not necessarily vindictive and does not, without more, violate the Due Process Clause. *See Bordenkircher v. Hayes*, 434 U.S. 357 (1978). "[J]ust as a prosecutor may forgo legitimate charges already brought in an effort to save the time and expense of trial, a prosecutor may file additional charges if an initial expectation that a defendant would plead guilty to lesser charges proves unfounded." *United States v. Goodwin*, 457 U.S. 380 (1982). Even if the government in Minnesota decided to

18

file an Indictment here that they would not have filed had he pleaded guilty to a global plea agreement in Pennsylvania, that does not evince vindictiveness.

Moreover, Mr. Broussard offers no evidence to support his assertion that the Minnesota Indictment was solely punishment for not pleading guilty in Pennsylvania, and the record flatly belies such a suggestion. The crimes with which Mr. Broussard is charged in Minnesota began in 2014 and lasted until December of 2016. The Minnesota investigation appears to have begun in 2016, and continued at least until sometime in 2017, if not later. This is a serious case, with many serious charges and a significant multistate investigation; the Pennsylvania case, in contrast, involved more narrow charges related to a single death. The Court declines to presume that the prosecutors in Minnesota chose to bring charges against Mr. Broussard, not because his Minnesota crimes allegedly led to the deaths of eleven people around the country, but purely to punish him for exercising his rights in Pennsylvania. Mr. Broussard fails to raise even a showing of improper motive sufficient for a prima facie case, *see United States v. Hirsch*, 360 F.3d 860, 864 (8th Cir. 2004), and the Court will not simply assume bad faith on the government's part in the face of such serious allegations.

### 3. Selective Prosecution

Mr. Broussard next argues that the government violated his due process rights through improperly selective prosecution when it chose to Indict him but not D.L.S., a person to who Mr. Broussard allegedly sold fentanyl and who in turn provided it to his girlfriend who died as a result. [ECF No. 44 at 22]. Mr. Broussard suggests that the government's decision not to charge

D.L.S., and perhaps to utilize him as a trial witness, is somehow improper. This argument must fail.[12]

In order to prove selective prosecution, a defendant must show that (1) people who were similarly situated to him were not prosecuted, and (2) the decision regarding whom to prosecute had an impermissible discriminatory motivation. *See, e.g.*, *United States v. Peterson*, 652 F.3d 979 (8th Cir. 2011); *United States v. Hirsch*, 360 F.3d 860, 864 (8th Cir. 2004). Here, there is no evidence whatsoever, and indeed no allegation, that the government in this case chose to prosecute Mr. Broussard, who is allegedly responsible for many deaths, instead of D.L.S., who allegedly bears some responsibility for one, for an improper reason. Indeed, we have no information about D.L.S. to enable a comparison to Mr. Broussard's situation or to support an inference of discrimination. Mr. Broussard simply fails to meet his burden to prove any improper motive in the complained-of exercise of prosecutorial discretion.

### 4. Outrageous Government Conduct

Mr. Broussard points to actions taken by the government during the course of this prosecution as evidencing bad faith or prosecutorial misconduct, generally. In order to prove government conduct was sufficiently egregious to justify dismissal of an indictment, the complained-of conduct must "shock the conscience of the court." *United States v. Nguyen*, 250 F.3d 643, 646 (8th Cir. 2001). "Outrageous government conduct requires dismissal of a charge only if it falls within the narrow band of the most intolerable government conduct." *United States*

---

[12] The government offers almost no analysis and cites no authority in opposition to this claim, just noting that it is "odd" that Mr. Broussard is arguing that he should not be charged while asserting that someone much less culpable than himself ought to have been.

*v. Bugh*, 701 F.3d 888, 894 (8th Cir. 2012) (quotation omitted). Mr. Broussard is entirely unable to meet the high showing to sustain such a claim.

Mr. Broussard complains about an argument made by the Assistant United States Attorney at the detention hearing in this case. [ECF No. 44 at 13]. Specifically, he alleges that the government improperly argued that Mr. Broussard learned of the fentanyl overdoses at some point before all of the overdoses described in the Indictment occurred. The government suggested that Mr. Broussard should have taken steps to protect his customers at that point, and that his failure to do so demonstrated his dangerousness to the community. The Court sees no impropriety in the government having made this argument at the detention stage – the Court considered it along with the rest of the record in determining whether there were conditions that could reasonably assure the safety of the community and the defendant's appearance in court as required by the Bail Reform Act. 18 U.S.C. § 3142(b). And it will be up to the district court whether such evidence or argument is admissible at Mr. Broussard's trial in this case. The fact that the detention argument was made does not support any relief at this stage.[13]

## C. Motions to Suppress

Mr. Broussard also challenges the searches conducted during the investigation of his case. In the record before the Court are ten search or tracking warrants. Although each has its own supporting affidavit, those affidavits are very similar in their core content, with later warrant applications adding information received through the execution of previous warrants. Mr. Broussard's challenges to all of the warrants and applications rely upon several common

---

[13] Mr. Broussard also "believes" that the government made this argument before the grand jury and argues that doing so was improper. Not only does Mr. Broussard have no evidence that this argument was made to the grand jury, but even if it was, it is not the sort of "gross purposeful deception" contemplated by *Roach*, 28 F.3d at 739.

arguments: First, he argues that the warrants rely on a fundamental mischaracterization of the relevant law. Second, Mr. Broussard asserts that each of the warrants were issued based upon an insufficient showing of probable cause. Third, Mr. Broussard alleges that the warrants contained falsehoods or misrepresentations of a factual nature or omitted critical evidence.

After reviewing each of the warrants carefully, the Court recommends rejection of Mr. Broussard's challenges and denial of the Motions to Suppress.[14]

### 1. The Government's Theory of Guilt

Mr. Broussard argues that affidavits submitted by the government in support in support of the warrant applications, misstate the law and lack sufficient factual allegations to support an inference of any illegal activity. The flaws Mr. Broussard highlights are all premised on the same argument he makes in his motion to dismiss the indictment—that the government's theory of guilt is fatally flawed. Specifically, he argues that the facts alleged demonstrate that his alleged possession or distribution fentanyl was unknowing, that what he thought he was dealing with was not a controlled substance but a controlled substance analogue, and that he therefore could not have had the requisite intent for a controlled-substance crime under the CSA. He further argues that the affidavits and warrants fail to specifically allege criminal activity concerning controlled-substance analogues, as opposed to controlled substances. Consequently, he argues, the warrant applications could not establish probable cause to believe the criminal activity alleged was taking place. Because the Court has already found this claim to lack merit, it recommends dismissing the motions to suppress to the extent they rely on the same argument.

---

[14] The Undersigned Magistrate Judge signed two of the warrants at issue. However, because those warrants heavily rely upon a common core of pertinent facts that had been previously found to support probable cause by several other judges, the Court determined that reviewing Mr. Broussard's challenges to her own warrants as part of this R&R was not inappropriate.

### 2.  Four Corners Challenge to Probable Cause

Mr. Broussard seeks a four-corners review for all ten of the warrants used in the investigation, arguing that the information within the supporting affidavits did not establish probable cause. A careful review of each warrant demonstrates that this argument is unavailing.

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. Among the requirements of the Fourth Amendment is that search warrants be based on probable cause. *United States v. Montes-Medina*, 570 F.3d 1052, 1059 (8th Cir. 2009). When deciding whether there is probable cause to issue a warrant, a magistrate judge's task is "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before [her], . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. Hudspeth*, 525 F.3d 667, 674 (8th Cir. 2008) ("If an affidavit in support of a search warrant sets forth sufficient facts to lead a prudent person to believe that there is a fair probability that contraband or evidence of a crime will be found in a particular place, probable cause to issue the warrant has been established."). "There must be evidence of a nexus between the contraband and the place to be searched." *United States v. Johnson*, 848 F.3d 872, 878 (8th Cir. 2017).

Whether for the initial issuance of a warrant or a review of one upon a defendant's challenge, when the probable cause determination relies solely on an affidavit, only the information "found within the four corners of the affidavit may be considered." *United States v. Wells*, 347 F.3d 280, 286 (8th Cir. 2003). "A reviewing court should afford great deference to the probable cause determination of the issuing judge." *U.S. v. Tripp*, 370 Fed. Appx. 753, 758 (8th Cir. 2010) (citing *Hudspeth*, 525 F.3d at 674). "[T]he duty of a reviewing court is simply to

ensure that the [issuing court] had a substantial basis for concluding that probable cause existed."
*Illinois v. Gates*, 462 U.S. 213, 214 (1983).

Of the warrants challenged by Mr. Broussard, the earliest was signed on June 27, 2016, and authorized the search of a priority mail envelope.[15] [ECF No. 53, Ex. 12 at 6–8,]. The application for this warrant was supported by an affidavit of United States Postal Inspector K.E. Nichols. Having thoroughly reviewed Inspector Nichols' affidavit, the Court concludes that it makes an ample showing of probable cause.

Inspector Nichols' affidavit describes a joint-agency investigation into Mr. Broussard's involvement in the distribution of fentanyl to various locations across the United States via the U.S. Mail system. [ECF No. 53, Ex. 12]. The investigation began after a Michigan hospital doctor contacted the DEA office in Grand Rapids to advise of a patient's hospitalization due to a fentanyl overdose, according to toxicology reports. The same doctor informed the patient's mother, who searched the patient's room to find a package of what later tested positive for fentanyl, which had been sent via the U.S. Mail system through a USPS "Click-N-Ship" account. The Click-N-Ship account was found to have been opened in January of 2014 with the name Aaron BROUSSARD attached and "PlantFoodUSA@live.com" provided as an email address. Over the six-month period preceding investigators' initial review of the account, all but two of the 139 mailings initiated through it, including the one found in aforementioned patient's

---

[15] There is also, before the Court, a second warrant issued on June 27, 2016, signed five minutes after the first by the same magistrate judge, and authorizing the search of a different priority mail envelope. [ECF No. 53, Ex. 13]. Because these warrants relied upon affidavits that were identical in all respects, save for the paragraphs identifying the specific envelope for which the warrant was sought, the analysis of the first warrant in this R&R applies equally to the second, and the two will be discussed as if one. Indeed, Mr. Broussard does the same in his brief. [ECF No. 44 at 49–50] ("The defendant incorporates [the arguments pertaining to the first warrant] . . . because the instant warrant and its accompanying affidavit . . . are identical . . . .").

24

bedroom, listed "Friendly Delivery" as the sender's name, "PlantFoodUSA@live.com" as an email address, and one of two PO Boxes as a return address. The other two mailings listed "Aaron BROUSSARD" as the sender's name. Between the time of the account's creation and the investigation described in Inspector Nichols' affidavit, the account had generated 1450 mailing labels.

Investigators ran an internet search for "PlantFoodUSA" and found a website with the same domain name which appeared to offer for sale, at different times, 4-FA and Dimethylphenidate—a possible controlled substance analogue. As its contact information, the website listed "PlantFoodUSA@Live.com." Investigators also found Reddit threads containing statements from supposed customers of PlantFoodUSA, who claimed that the products they received through the mail were not what was advertised or "much stronger."

In June of 2016, investigators learned that the DEA in Pennsylvania had a subject who, after being hospitalized due to an overdose, informed the DEA that the substance he had taken—believed to be "molly" —was received in the mail from PlantFoodUSA. The subject's girlfriend was also hospitalized after ingesting the substance and eventually died. Investigators utilized open source searching to find eight individuals with online obituaries, all of whom appeared to have received mail sent through Click-N-Ship account one to two months before to their deaths.

According to Inspector Nichols' affidavit, the mailing label attached to the envelope for which the warrant was sought was generated by the same Click-N-Ship account and listed the following return address: "FRIENDLY DELIVERY PO BOX 404 HOPKINS MN 55343-0404." PO Box 404 was one of the two provided for the previous mailings connected with the account, and following a routine inquiry, investigators learned that it was rented by Aaron Broussard.

Given all of the circumstances set forth in Inspector Nichols' affidavit, there was a substantial basis for finding probable cause to search the envelope. It was reasonable for the issuing court to infer from these circumstances that the envelope contained contraband or evidence of illegal activity. The label for the envelope to be searched was connected to an account that (1) had the same email address as the website PlantFoodUSA.net, which purported to sell controlled substance analogues; and (2) had initiated the mailing of at least two parcels containing substances that hospitalized at least three people after ingesting them—one of which tested positive for fentanyl. Using common-sense, practical judgment, these circumstances are more than sufficient to support a finding of probable case. And given the significant deference a reviewing court is required to give to the issuing court's determination, the information in Inspector Nichols' affidavit easily meets the threshold of providing a substantial basis for probable cause.

Mr. Broussard requests a four-corners review of each of the remaining eight warrants before the Court. Each of the affidavits supporting the subsequent warrants all share a common core of facts with the affidavit of Inspector Nichols described above. The Court has thoroughly reviewed each of the other affidavits and concludes that they, for the same reasons as the those mentioned above, also provided substantial basis for the issuing courts to have found probable cause. A quick summary of those warrants demonstrates the strength of the showing in support of each one.

The warrant issued on June 30, 2016 [ECF No. 53, Ex. 14] enabled searches of four additional mail envelopes. It relies on an affidavit that contains the same information contained in the previous warrant packet. The affiant then adds that when investigators executed the previous warrants they discovered that the envelopes contained small black packets wrapped in

paper, some of which had the letters "PFUSA" on them, and that the packets contained "what felt like a powdery or crystalline substance." [ECF No. 53, Ex. 14 at 10]. This information readily provides a substantial basis for finding probable cause.

The warrant issued on July 11, 2016, [ECF No. 53, Ex. 15] authorized the search of a cellphone, believed to be owned or used by Mr. Broussard, and sought information about the location of that phone. The supporting affidavit, signed by Special Agent Terrence Olstad, reiterated all of the pertinent facts from the previous affidavits, and added, among other things, that toll records revealed several contacts between Mr. Broussard's phone and another individual suspected of drug trafficking, from whom undercover purchases of controlled substances had been accomplished. The affidavit also provides that in 2014, a package addressed to "Gloria Broussard" from China was seized by the Department of Homeland Security, and found to contain over 100 grams of 4-FA. The Court concludes that the records of contact between Mr. Broussard's phone number and an individual known to the DEA to be selling controlled substances, in tandem with the other circumstances, creates a sufficient nexus between the phone's location data and the suspected criminal activity. *Johnson*, 848 F.3d at 878. This application was supported by probable cause.

The next warrant, issued on July 12, 2016, [ECF No. 53, Ex. 7] authorized the search of email address "plantfoodusa@live.com" for the period between January 2016 and the present. The supporting affidavit signed by Task Force Officer Jason Gula reiterates all of the pertinent facts from the Nichols and Olstad affidavits and adds considerably more detail concerning the email address "plantfoodusa@live.com," such as its use to facilitate and confirm controlled purchases of controlled substances from PlantFoodUSA.NET. These allegations provide ample basis for finding probable cause.

The warrant issued August 5, 2016, [ECF No. 53, Ex. 8] authorized the search of information associated with the email address "CHOSENBOYBOY@HOTMAIL.COM." The affidavit, also signed by Officer Gula, alleges the same key facts as the prior warrants, and adds that subpoenaed information from PayPal revealed that Mr. Broussard had a PayPal account that used the email address CHOSENBOYBOY@HOTMAIL.COM. Investigators also discovered that this email address is associated with a bank account used by the Click-N-Ship account that uses the name "Friendly Delivery." The Court concludes that this provides sufficient basis for probable cause to search that email account.

On November 2, 2016, investigators obtained an order authorizing interception of electronic communications involving the email address PLANTFOODUSA@LIVE.COM.[16] The affidavit recounted the pertinent facts present in the prior applications, emphasizing that the email account was being used to facilitate the distribution of the substances, send receipts of purchase, and adding new information that investigators learned from execution of the prior warrants. [ECF No. 53, Ex. 9]. The order authorizing interception of the email account found that the affidavit had established probable cause. On review of the materials, the Court agrees.

On December 5, 2016, the undersigned issued two warrants—one authorizing the taking of a DNA sample from Mr. Broussard; and the other enabling the search of Mr. Broussard's apartment in Hopkins, Minnesota, and the seizure of various items, including fentanyl and other controlled substances, records, documents, and electronic equipment. [ECF No. 53, Exs. 10, 16].

---

[16] Mr. Broussard only included the affidavit for this order with his filings, which he marked as Exhibit 9. At the hearing, the government provided the Court with a printed copy of the warrants in the record, which were identical in all respects to Mr. Broussard's Exhibits 7–16, except that it included the order granting the application for interception of communications, as well as some materials related to that application and order. The government marked all of these additional documents as Exhibit 10. The Court will have the entirety of the government's Exhibit 10 separately filed upon the filing of this R&R.

The Court issued the warrant upon an affidavit that asserted all pertinent facts from prior affidavits, including the Department of Homeland Security's interception of a parcel containing controlled substances addressed to Mr. Broussard at the address for which the search warrant was sought. The affidavit also added that investigators interviewed the postal carrier who delivered mail to Mr. Broussard's apartment, and she stated that she delivered domestic and international packages to that address on numerous occasions, and that the review of Mr. Broussard's bank records revealed that he issued personal checks on a monthly basis to the rental company that services his apartment. The affidavit also provided that investigators had recovered a DNA profile of an unknown male from a Ziploc baggie containing white crystalline powder which was found in the office of one of the overdose victims. Having again reviewed the affidavit, the Court concludes that it offered sufficient probable cause for the warrants.

Finally, the warrant issued on April 14, 2017, authorized the search of the email address "tagged12345@ymail.com." The affidavit, like all the others, recounted the same facts as the preceding warrant applications and investigations, adding that officers seized a number of different electronic and storage devices during the search of Mr. Broussard's apartment, that these revealed that the "tagged12345" email address was used by Mr. Broussard to communicate with email addresses that were associated with a China-based pharmaceutical research chemical company. The circumstances contained in this affidavit supply ample probable cause for the search of this email address.

In sum, the Court has reviewed each warrant challenged by Mr. Broussard and the documents submitted in support of those warrants. Each one was based on an adequate showing of probable cause, and his arguments to the contrary should be rejected.

### 3. Alleged Misrepresentations and Omissions

29

Mr. Broussard also challenges the warrants by pointing to what he describes as false and misleading statements contained in the supporting affidavits. He seeks suppression of seized evidence or, perhaps, a hearing to explore these issues further.

Under *Franks v. Deleware*, a hearing is appropriate if a defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause. *United States v. Jacobs*, 986 F.2d 1231, 1233–34 (8th Cir. 1993) (citing *Franks v. Delaware*, 438 U.S. 154, 155–56, (1978)). To get a *Franks* hearing, then, Mr. Broussard must show "(1) that police omitted facts with the intent to make, or in reckless disregard of whether thy thereby made, the affidavit mislead, . . . and (2) that the affidavit if supplemented by the omitted information would not have been sufficient to support a finding of probable cause." *Id.*

Mr. Broussard argues that the affidavit supporting the July 12, 2016, application for a warrant to search the "PlantFoodUSA" email address, "associate[ed] the alleged item or substance 4-FA with the description 'Adderall' by quoting an alleged victim labeling such item or substance that, causing a misleading and prejudicial effect."[17] [ECF No. 44 at 34–35]. The Court concludes that this assertion, even if true, would not warrant a *Franks* hearing. First, the

---

[17] Mr. Broussard also argues that the affidavit failed to allege whether the distribution of fentanyl was committed intentionally, thereby implying that that was the case; and that the affidavit, while mentioning incriminating posts from Reddit users, omitted posts that were "exculpatory" because they evidenced that the distribution of fentanyl was unknowing and unintentional. However, these arguments, like many of his others, are premised on his incorrect assertion that he cannot be convicted of distribution of fentanyl if he believed he was distributing an analogue. Accordingly, even if the affidavits did omit evidence which suggested that Mr. Broussard believed he was distributing an analogue—not fentanyl—there would still be probable cause to believe that a crime had been committed and that the place to be searched contained evidence of criminal activity.

comparison between 4-FA and Adderall was not made by investigators or the affiant. Rather, it was made by a witness, trying to explain to investigators what he believed he was ingesting, and was simply recounted by the affiant. This undermines the claim that the comparison was included with the intent to mislead. More importantly however, even if this fact were a misrepresentation made by investigators with the requisite intent, omitting this statement from the affidavit would not have any effect on the determination of probable cause, because additional information contained in the affidavit independently supported that finding. Accordingly, the Court recommends denying Mr. Broussard's request for a *Franks* hearing.

### D. Speedy Trial Claims

Mr. Broussard alleges that the pretrial delay he has experienced in this case violated his constitutional right to a speedy trial.[18] He argues that the delay between the dates of the offenses and the Indictment violated his due process rights under the Fifth Amendment, and that the delay between his Indictment and eventual trial violates his Sixth Amendment rights. After careful review, the Court disagrees with both arguments and recommends that his request to dismiss the Indictment against him on this basis be denied.

### 1. The Fifth Amendment Right to a Speedy Indictment

Although less well-developed than his Sixth Amendment claim, Mr. Broussard argues that he has experienced "prejudicial pre-indictment delay" and cites two Supreme Court cases in support of that argument.[19] This argument does not carry the day.

---

[18] Mr. Broussard does not allege that the Speedy Trial Act has been violated in this case. The Court's shares the government's assessment [ECF No. 55 at 12] that such a claim would be unsuccessful based on the record in this case.

[19] The government does not address this argument in its motion, focusing entirely on the post-Indictment Sixth Amendment argument.

The Eighth Circuit has explained that "while statutes of limitations provide the primary guarantee against delay prior to indictment or arrest, the due process clause of the Fifth Amendment does play a limited role in protecting against oppressive delay." *United States v. Jackson*, 446 F.3d 847, 849 (8th Cir. 2006). And it is clear that the statute of limitations, rather than the Due Process Clause, is the primary source of protection "against bringing overly stale criminal charges." *United States v. Reed*, 647 F.2d 849, 853 (8th Cir. 1981). Mr. Broussard has raised no statute of limitations argument in this case, and the Court sees no basis for him to do so. As a result, Mr. Broussard must "overcome a high hurdle when contending that a pre-indictment delay that does not violate the statute of limitations is violative of the due process clause." *Jackson*, 446 F.3d at 849.

Defendants claiming a due process violation for pre-indictment delay must establish both that the delay resulted in "actual and substantial prejudice to the presentation of his defense," and that the government intentionally delayed "either to gain a tactical advantage or to harass him.". *Jackson*, 446 F.3d at 849–50 (citing *United States v. Sturdy*, 207 F.3d 448, 452 (8th Cir. 2000)). Here, Mr. Broussard fails to make a showing on either prong. He does not point to any way in which the three years that passed between the bulk of events described in the Indictment and the return of that Indictment have made it impossible or even more difficult for him to defend himself against these charges. And although he asserts that the purpose of the delay must have been to coerce a guilty plea, he offers no support for that. He is simply unable to meet the substantial showing required for a claim of improper pre-indictment delay under the Fifth Amendment.

## 2. The Sixth Amendment Right to a Speedy Trial

Mr. Broussard also argues that the passage of time between his Indictment and his eventual trial is an ongoing violation of his constitutional right to a speedy trial. The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial." This right attaches at the time of either arrest or Indictment, whichever is earlier, and continues until a defendant's criminal trial begins. *See United States v. Flores-Lagonas*, 993 F.3d 550, 563 (8th Cir. 2021). In *Barker v. Wingo*, 407 U.S. 514 (1972), the Supreme Court identified four factors that guide a Court's analysis of a constitutional speedy trial claim, and those four factors remain the standard today. A court must consider (1) the length of delay; (2) the reason or reasons for the delay; (3) whether and when a defendant has asserted his right to a speedy trial; and (4) the prejudice caused to the defendant by the delay. *Barker v. Wingo*, 407 U.S. at 530. Although these factors are important, they are not the only considerations and courts "must still engage in a difficult and sensitive balancing process." *Id*. at 533. Here, the Court has carefully reviewed the record and finds no constitutional violation.

**The Length of Delay**

Mr. Broussard's Indictment was issued in April of 2019. It is now July of 2021, and Mr. Broussard's trial is likely still a few months away. Therefore the "length of delay" exceeds 27 months. This is long enough, according to the Eighth Circuit, to merit further examination. *United States v. Johnson*, 990 F.3d 661 (8th Cir. 2021). And the government concedes that this length of delay weighs in favor of Mr. Broussard in the calculus. [ECF No. 55 at 13].

**Reasons for the Delay**

Analysis of the second *Barker* factor is more complex in this case. The government spends several pages usefully exploring the reasons for delay in the handling of the Pennsylvania

case.[20] [ECF No. 55 at 13–16]. And the Court agrees with the its overall assertion that the government, either in Pennsylvania or in Minnesota, is not responsible for the length of time that passed between his Indictment in Pennsylvania and the eventual dismissal of the charges there. Instead, the record supports that a combination of delays to which Mr. Broussard agreed to enable plea negotiations, delays requested by the defendant to enable trial and motion preparation, delays related to Mr. Broussard changing counsel, and, to a lesser extent, a delay caused by the death of a judge, were responsible for the passage of approximately four years in Pennsylvania. While the Court does not fully embrace the government's characterization that "the defendant was responsible for most of the delay" in Pennsylvania, it is clear that much of it was either attributable to the defense or agreed to by it. The Court finds that this reality weighs against Mr. Broussard's claim that the delay has been unconstitutional.

However, the Court also concludes that the delay in the MDPA case has relatively little bearing upon the Court's analysis in *this* case. The delay between Mr. Broussard's Indictment in Minnesota in April of 2019 and his initial appearance in this district for prosecution on that Indictment is primarily attributable to waiting to commence proceedings here while the Pennsylvania case was still being actively litigated. "It is generally accepted that a delay occasioned by the prosecution of the defendant in another jurisdiction is not a basis for a dismissal on constitutional speedy-trial grounds." *United States v. Ellis*, 622 F.3d 784, 791 (8th Cir. 2010) (collecting cases, including *United States v. Brown*, 325 F.3d 1032, 1035 (8th Cir. 2003); *United States v. Schreane*, 331 F.3d 548, 555 (6th Cir. 2003) (holding that "simply waiting for another sovereign to finish prosecuting a defendant is without question a valid reason

---

[20]  Mr. Broussard does not express disagreement with any of the government's procedural history. Rather, he focuses on the government's motives, concluding that the delays were "primarily an effort to further coerce a plea agreement."

for delay.")); *but see United States v. Myers*, 930 F.3d 1113, 1120–21 (9th Cir. 2019) (declining

to adopt a bright line rule, and requiring assessment of whether the completion of another

jurisdiction's case justified delay in a particular case).

> Although many cases considering the speedy-trial implications of separate
> prosecutions involve one state and one federal prosecution, the practical problems
> of simultaneous criminal proceedings in separate jurisdictions are the same
> regardless of whether the sovereign prosecuting each case is the same or different.
> In both situations, the administrative difficulties and safety concerns presented by
> parallel prosecutions generally justify delaying the second case.

*Id.* at 791. Mr. Broussard does not argue that the Minnesota prosecutor should have tried to have

him transferred from Pennsylvania to face charges here at any point between his Indictment and

the eventual conclusion of the Pennsylvania case, and the Court would see little merit in such a

claim. Even Courts that have declined to adopt a bright-line rule that pre-arrest delay caused by a

defendant facing charges in another district does not raise speedy trial concerns have found that

when facts at issue in the two cases overlap, trying a defendant concurrently on the two sets of

charges would be unworkable and the resulting delay is particularly defensible. *Myers*, 930 F.3d

at 1121.[21]

An additional reason for some of the delay in bringing Mr. Broussard to trial in this

district is that for 15 of the months that have passed between his indictment and today, the Court

---

[21] It is noteworthy that some of the Courts who decline to adopt a per se rule that waiting for
another jurisdiction's prosecution to conclude is a valid reason for post-Indictment delay criticize
the government's failure to notify either the Court or the defendant about the existence of the
Indictment. Here, the government apparently did both. Mr. Broussard's Indictment was returned
on April 10, 2016, and the government advised the Court in the District of Minnesota of that
Indictment's relationship to the Pennsylvania case less than a week later. [ECF No. 4]. Mr.
Broussard was also notified at some point because, by August of 2016, he had filed his first pro
se motion in this district. In response to that motion, this Court took the somewhat unusual step
of appointing counsel here in Minnesota to represent him on the Minnesota case despite the fact
that he had yet to make a first appearance in this district. [ECF No. 7]. From that point on, Mr.
Broussard not only had actual awareness of this case, but had counsel to assist him in this
prosecution.

has been operating during a global pandemic. The Court has faced a greatly reduced ability to hold court appearances during that time, and transportation of prisoners back and forth between two states to enable simultaneous prosecutions, already an expensive and unworkable plan, would have been entirely impossible during the pandemic. *See, e.g., In Re: Updated Guidance to Court Operations Under the Exigent Circumstances created by COVID-19*, General Order No. 22 (D. Minn. Nov. 24, 2020).

In sum, the Court finds that, although 27 months have passed between Mr. Broussard's Indictment and today, most of that delay is attributable to the pending Pennsylvania case. Indeed, Mr. Broussard was promptly arrested and brought to Minnesota once it became clear that the case was going to be dismissed, even before the Motion to Dismiss was actually filed. He made his initial appearance on December 1, 2020, and the case has proceeded in a timely fashion since that date. Therefore, the reason for the delay, while not Mr. Broussard's fault, is also not attributable to the government and weighs strongly against a finding of a constitutional violation.

### Assertion of Right to a Speedy Trial

The third *Barker* factor also weighs somewhat against Mr. Broussard's Sixth Amendment speedy-trial claim. He has now clearly invoked his right to a speedy trial, but Mr. Broussard candidly concedes that he did not do so at any time before the filing of his 61-page brief on April 14, 2021. Indeed, although he filed four pro se motions between when he learned about the Minnesota Indictment and his arrival here, none of them raised a speedy trial claim and none of them even discuss a delay in bringing him to trial. [ECF Nos. 5, 6, 9, 11]. And Mr. Broussard's counsel in this district, appointed just months after his Indictment, never asserted a speedy trial claim on his behalf at any point.

### Prejudice

The final factor, prejudice to Mr. Broussard, also weighs against a finding of a speedy trial violation in this case. The degree of prejudice required to sustain a Sixth Amendment claim "depends on the defendant's showing under the preceding *Barker* factors." *United States v. Sims*, 847 F.3d 630, 636 (8th Cir. 2017). Prejudice may be shown in three ways: (1) oppressive incarceration prior to trial; (2) the defendant's anxiety and concern; and (3) a possibility that the defendant's defense will be impaired. *Doggett v. United States*, 505 U.S. 647, 654 (1992). A defendant is required to show "actual prejudice" if the government is not responsible for unreasonable delay in a case. *See United States v. Erenas-Luna*, 560 F.3d 772, 778–79 (8th Cir. 2009).

It is true that "oppressive" pretrial incarceration is one of the harms the Sixth Amendment's speedy trial protections must be read to prevent, *Barker*, 407 U.S. at 532, and Mr. Broussard has been in pretrial custody since 2016. However, he has only been in pretrial custody on the Minnesota charges since December, roughly seven months and far less than would sustain a constitutional challenge. *Sims*, 847 F.3d at 636 (finding a 12.5-month delay, even one attributable to the government, is not enough to require a per se finding of prejudice). And, as the government has highlighted, the clock counting Mr. Broussard's rights under the Speedy Trial Act has not approached the 70-day limit on delay between initial appearance and trial. [ECF No. 55 at 12].[22]

Mr. Broussard is also unable to show that his ability to defend himself or raise a defense has been harmed by the delay he has identified. He points to no missing or destroyed evidence, no witnesses who have become unavailable, and no defense he can no longer raise. Indeed, such

---

[22] "It is unusual to find a Sixth Amendment violation when the Speedy Trial Act's time strictures have been satisfied." *United States v. Sprouts*, 282 F.3d 1037, 1042 (8th Cir. 2002).

concerns, to the extent they ever existed, were arguably ameliorated by the appointment of counsel for Mr. Broussard in this District years before he was actually arrested here.

In sum, the Court finds that Mr. Broussard is unable to establish prejudice from the post-Indictment pre-trial delay he has so far experienced, and is unable to demonstrate that his Sixth Amendment right to a speedy trial has been violated in this case.

## IV.    RECOMMENDATION

Having thoroughly reviewed the briefs and the parties' arguments at the hearing, for the foregoing reasons, the Court makes the following **RECOMMENDATIONS**:

1. That Mr. Broussard's Motions to Dismiss the Indictment [ECF No. 5, 6, 9, 44] be **DENIED**; and

2. That Mr. Broussard's Motion to Suppress [ECF No. 45] be **DENIED.**


Date: July 13, 2021                                    s/ *Katherine Menendez*
                                                       Katherine Menendez
                                                       United States Magistrate Judge

**NOTICE**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.