```
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF MINNESOTA
 2

 3     ------------------------------------------------------------
                                    )
       UNITED STATES OF AMERICA,     )   File No. 19-CR-101
 4                                   )            (SRN/KMM)
                Plaintiff,           )
 5                                   )
       vs.                           )   Saint Paul, Minnesota
 6                                   )   December 11, 2020
       AARON RHY BROUSSARD,          )   2:00 p.m.
 7                                   )
                Defendant.           )   Zoom for Government
 8                                   )   Videoconference
       ------------------------------------------------------------
 9
             BEFORE THE HONORABLE KATHERINE M. MENENDEZ
10           UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
                   (ARRAIGNMENT AND DETENTION HEARING)
11
       APPEARANCES
12      For the Plaintiff:        UNITED STATES ATTORNEY
                                  THOMAS M. HOLLENHORST, AUSA
13                                300 South Fourth Street
                                  Suite 600
14                                Minneapolis, Minnesota 55415

15      For the Defendant:        MADEL PA
                                  TODD HENNEN, ESQ.
16                                800 Hennepin Avenue
                                  Suite 800
17                                Minneapolis, Minnesota 55403

18      Court Reporter:           CARLA R. BEBAULT, RMR, CRR, FCRR
                                  Suite 146 U.S. Courthouse
19                                316 North Robert Street
                                  Saint Paul, Minnesota 55101

20

21

22
            Proceedings recorded by mechanical stenography;
23     transcript produced by computer.

24

25
```

1                              **I N D E X**

2
DEFENSE EXHIBITS                                          REC'D
3      Exhibit 1                                               9
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

**VIA ZOOM FOR GOVERNMENT VIDEO TELECONFERENCE**

1

2

3

4      THE COURT:  All right.  Let's go ahead and get

5  started.  We are here for a detention hearing and

6  arraignment in United States versus Broussard.

7  Mr. Broussard, am I pronouncing your name correctly?

8      THE DEFENDANT:  Yeah, you are.

9      THE COURT:  Okay.

10      THE DEFENDANT:  Yes, Your Honor.

11      THE COURT:  Okay.  At any time during today's

12  hearing if you can't see me or hear me, I want you to get my

13  attention.  Do you understand?

14      THE DEFENDANT:  Yes, I do.

15      THE COURT:  Okay.  Let's get appearances on the

16  record.  First on behalf of the United States.

17      MR. HOLLENHORST:  Good afternoon, Your Honor.  Tom

18  Hollenhorst for the United States.

19      THE COURT:  Excellent.  Welcome, Mr. Hollenhorst.

20      And here on behalf of Mr. Broussard today.

21      MR. HENNEN:  Todd Hennen, Your Honor.

22      THE COURT:  Okay.  Great.  Welcome, Mr. Hennen.

23      We are here to talk about detention, meaning

24  whether Mr. Broussard is going to continue to be held in

25  custody while this case proceeds, or released on conditions

1    of pretrial release.  We're also here to do what is called

2    an arraignment which is where we officially begin the case.

3            Before we do either of those things,

4    Mr. Broussard, we need to talk about the fact that you are

5    present on Zoom rather than at the courthouse.  In ordinary

6    times we would all be together at the courthouse.  You would

7    be sitting at a table next to your attorney.  I would be

8    there, the prosecutor would be at a nearby table.  Instead

9    of the witnesses and the family members and members of the

10   public watching from muted video, they would be sitting in

11   the back; and instead we're together on a videoconference.

12   The reason, of course, is because the Court is trying to do

13   everything in its power to slow the spread of Coronavirus

14   and to stop the impact of the pandemic, both in the

15   courthouse among lawyers, among judges, among probation

16   officers, but just as importantly among members of the

17   public and among people who are in custody.  As a result, we

18   are having as many proceedings as possible by Zoom.

19           You have a right to have today's proceedings in

20   person if you wish.  That choice is yours.  However, I

21   should let you know that it could be as many as a few weeks

22   before we are able to make an in-person proceeding happen

23   safely.  So you've got a choice to make today.  We can

24   either go ahead by Zoom if you are amenable to doing that,

25   or we can wait until we can do this in person.  I will

1   schedule it as quickly as possible, but it may be some time

2   before we are able to hold that hearing.

3           How would you like to proceed?

4           THE DEFENDANT:  I would like to proceed by Zoom.

5           THE COURT:  Okay.  Because we are on Zoom, it is

6   very important that everyone watching understand that you

7   are not to make any recordings of today's proceeding.  No

8   audio recordings, no video recording are permitted.  We do

9   have a court reporter.  We are making an official record of

10  today's proceeding.  No other records are permitted.

11          I'll also note for the record that we have many

12  people observing today's proceeding.  We have family members

13  of alleged victims who are present observing on Zoom.  We

14  have people related to Mr. Broussard who are present and are

15  observing on Zoom, and I have decided to give access freely

16  for anyone who asks for it to watch the proceeding, not just

17  listen to it.  But in an effort to keep everyone's focus on

18  the proceeding at hand, I have also asked the clerk to turn

19  off the audio and the video for the people who are watching

20  from their homes so that they don't fill the screen and make

21  our boxes smaller and smaller so that the participants can't

22  see the people who are speaking.  So I'll just note that

23  reality for the record.

24          Let's go first to the arraignment.  Mr. Broussard,

25  you have been charged by an Indictment with offenses related

1    to the alleged distribution of fentanyl and allegations

2    related to deaths that resulted from that alleged

3    distribution of fentanyl and other related charges in a

4    fairly lengthy Indictment.  Have you received a copy of the

5    Indictment in this case?

6             THE DEFENDANT:  Yeah, I did.  I seen it.  My

7    attorney did, but I seen it.

8             THE COURT:  It's okay if you don't have it with

9    you right now, but have you read and reviewed that

10   Indictment?

11            THE DEFENDANT:  Yes, I did.

12            THE COURT:  And I'm not about to ask you if it's

13   true or not at this stage, but do you understand the charges

14   against you?

15            THE DEFENDANT:  I do.

16            THE COURT:  Okay.  Now we have a choice.  I can

17   either read it out loud to you or we can skip that part.

18   What's your preference?

19            THE DEFENDANT:  Skip it.

20            THE COURT:  Okay.  That's called waiving the

21   reading and that's what we will do.

22            The last question is how do you plead to the

23   charges in the Indictment?

24            THE DEFENDANT:  Not guilty.

25            THE COURT:  Not guilty pleas will be entered on

1    your behalf as to all the charges in the Indictment.  We are

2    going to issue an order that contains the dates for the next

3    steps in this case.  That will be entered on the docket

4    later today and your lawyer, Mr. Broussard, and both counsel

5    will be able to access that and get those dates.  I'm not

6    going to take the time to read them right now.

7              I should also say, Mr. Broussard, in addition to

8    please getting my attention if you can't see or hear what's

9    going on, if at any time during today's proceeding you need

10   to visit privately with your attorney, we can make that

11   happen.  We can put you in what's called a breakout room

12   where no one else can hear your conversation, and it is not

13   part of the record or recorded in any way.  So please let me

14   know if you'd like to take advantage of that at any point.

15   Do you understand?

16             THE DEFENDANT:  Yes, I do.

17             THE COURT:  Okay.  We are proceeding with a

18   question of detention or release at this time.

19   Mr. Hollenhorst, how about I have you go first.  It is the

20   Government's motion seeking to detain Mr. Broussard; is that

21   correct?

22             MR. HOLLENHORST:  It is, Your Honor.

23             THE COURT:  Okay.  Are you going to offer

24   testimony today?

25             MR. HOLLENHORST:  No, Your Honor, we're going to

1    proffer and then we would reserve some time for argument.

2              THE COURT:  Okay.  I'd like you to go ahead with

3    your proffer and I also will note for the record that the

4    parties have communicated to me ahead of today's hearing,

5    which I appreciate, about some sort of factual agreements

6    that you have entered into for the purpose of today's

7    hearing.  I appreciate that kind of advance work.  I don't

8    need you to put any more on the record than you feel is

9    necessary.  I'll just expect you to cabin your arguments

10   accordingly, but let me know if there are any exhibits you'd

11   like to introduce.

12             I also note that I had looked at and reviewed the

13   Government's motion for detention and the corrections that

14   are discussed in a recent e-mail, and I'll accept that as

15   corrected.  So you can proceed, Mr. Hollenhorst, and then

16   we'll proceed with your testimony -- let me take one more

17   second.  I'm sorry.

18             Mr. Hennen, do you intend to call any witnesses

19   today?

20             MR. HENNEN:  Not at this time, Your Honor.  I

21   believe the proffer should be sufficient.

22             THE COURT:  And do you intend to offer exhibits?

23             MR. HENNEN:  We e-mailed one exhibit to Your

24   Honor, I believe it was yesterday.  The Court acknowledged

25   receipt of it.  It was a number of certificates and awards

1    that Mr. Broussard had received during his time in detention

2    in Pennsylvania.

3              THE COURT:  Got it.  I'm actually looking at those

4    right now and I did receive those ahead of today's hearing.

5              MR. HENNEN:  Excellent.  I think that would be our

6    only exhibit, Your Honor.

7              THE COURT:  Okay.  To make the record clear,

8    Mr. Hollenhorst, do you have any objection to the

9    introduction of what I will call Defendant's Exhibit 1,

10   which is a collection of materials that he earned while he

11   was in custody or prepared while he was in custody?

12             MR. HOLLENHORST:  No objection, Your Honor.

13             THE COURT:  Okay.  That will be admitted.  I have

14   looked at it.  I'll continue to glance at it during the

15   course of the proceedings.

16             Now you can go, Mr. Hollenhorst.

17             MR. HOLLENHORST:  Thank you, Your Honor.  Your

18   Honor, we have filed an extensive memorandum in this case

19   setting forth the facts and circumstances of the case.  I'm

20   not here to repeat all of that.  I know the Court has read

21   that motion.  The thing I would like to do is highlight just

22   a couple aspects of the motion and the matters contained in

23   it.

24             First of all, we have a situation here where the

25   defendant's actions we believe caused the deaths of 11

1   people and also caused serious bodily injury to 4 more

2   people.  This was all caused by a bad dose of fentanyl that

3   the defendant had received from China.  We acknowledge that

4   Mr. -- for purposes of this hearing that Mr. Broussard may

5   not have known that it was fentanyl that he had received

6   from China.

7          Nevertheless, once he received this compound,

8   which we think he thought was 4-FA, a controlled substance

9   analog, he then answered customers' requests for small

10   amounts of the substance which he dutifully mailed off for

11   profit.  Victims then received these items in the mail and

12   at various times thereafter ingested the substance causing

13   the death almost immediately of most of the victims, and

14   serious bodily injury to the others.

15          Significantly, the defendant, we can prove, found

16   out at least that people were -- that he had gotten a bad

17   batch.  I think his words were that the order was mixed up.

18   Thereafter, Mr. Broussard continued to receive drugs from

19   China and dispense them in the same manner using his

20   Internet-based enterprise to distribute more illegal drugs

21   to members of the community throughout the United States.

22          Now, one thing that we feel is quite significant

23   is two of the victims in this case -- actually three of the

24   victims, two who died and one who survived, took the fatal

25   doses of fentanyl even after we can prove the defendant knew

1    he had gotten a bad batch, so to speak.  He did not bother

2    to contact these customers to tell them that other people

3    had been sick or died.  He just let it be.  And had he done

4    what a normal, I guess, person would have done, and that is

5    be concerned about these customers, we would hope that he

6    would have reached out to them.

7            That's significant, Your Honor.  We are

8    acknowledging that the defendant -- at least we have no

9    evidence that the defendant distributed fentanyl before or

10   after this critical month in April of 2016.  But even during

11   that timeframe he had the opportunity, he had the ability,

12   to save lives and he did not do that.

13           We took the case down in December 6th, 2016.

14   During that time span we, as the Government, were highly

15   concerned that the defendant may be dispensing other fatal

16   drugs to customers.  We intercepted a number of these

17   packages and determined that he was not sending fentanyl but

18   we were concerned about it and we eventually took the case

19   down because of our concerns that other members of the

20   community were at risk.

21           Even after the defendant communicated with his

22   China sources, he continued to order designer drugs that

23   were lethal drugs.  We have evidence that the defendant at

24   least negotiated or discussed with his China-based suppliers

25   drugs that are as lethal as fentanyl.  And we do intend to

1     call a witness at trial, if it gets to that, who will

2     testify to the serious nature of these additional drugs that

3     the defendant decided to, or at least was considering

4     peddling, even after knowing that others had died.

5           Your Honor, our main case for detention here is

6     that this offense is so serious, these offenses are so

7     serious, causing the death of 11 people and serious bodily

8     injury to 4 others, and quite honestly, Your Honor, we

9     believe that there are other victims who we have not yet

10    identified.  But because of all this, you would think that a

11    defendant would show some remorse.  We have not seen remorse

12    in any way, shape or form.  I think remorse is a very

13    important consideration in determining whether or not a

14    person is at further risk, poses a risk to the community and

15    poses a risk of flight.

16          We feel that there is no evidence in this case to

17    support a -- the proposition that the defendant does not

18    pose a risk of flight or does not pose a danger to the

19    community.  He is looking at a mandatory minimum sentence of

20    20 years on most of the counts of the Indictment.  He's

21    looking at a maximum sentence of life on many of the counts

22    of the Indictment, and he's looking at a guideline range

23    that I guess one could best describe as astronomical.

24          He looks like he would have a Base Offense Level

25    of 38, another 4 levels for various enhancements, which

1    would result in an adjusted offense level of 42.  And

2    regardless of criminal history, that calls for a guideline

3    range of 360 months to life.  That sentence, that potential

4    sentence alone, we think poses a significant risk of flight.

5            Your Honor, the other thing that I would like to

6    state before closing is that there are real-live victims in

7    this case, and you can see from your screen that many of

8    these victims' families are participating today.  I have

9    included in my motion a quote that was sent to us by one of

10   the families.  Another family has asked me to state

11   something that in an e-mail, and I'll summarize -- and I'm

12   sure that the family members would understand that they are

13   not parties here but they are very important people in

14   attendance and they have a right to be heard.  And one

15   couple wrote earlier today that they would ask that this

16   person, this defendant, be held in custody because they

17   fear -- they fear not for their own lives but for the lives

18   of other people, many other people in the community.

19           And this business the defendant had is one that

20   could be regenerated in ten minutes.  He's already got the

21   contacts.  He's got the knowledge.  He's got the customer

22   base.  He can be pushing these drugs out to the community

23   within a matter of hours from his release.

24           And, Your Honor, whether or not he will do that we

25   don't know, but the risk of him doing that we feel is so

1      great that the only thing we can do in this case and the

2      only thing we ask for, coupled with the presumption of

3      detention in the case, is the defendant's detention pending

4      trial.

5                Thank you, Your Honor.

6                THE COURT:  Mr. Hennen, your turn.

7                MR. MADEL:  Thank you, Your Honor.  First I would

8      just like to say that I understand that we have family

9      members of some of the people who have passed away on this

10     call and at the outset I want to say that this case involves

11     an awful, awful tragedy, and I cannot imagine the pain and

12     the grief that these people must feel.

13                But this hearing is not about punishing

14     Mr. Broussard, nor is it about trying to alleviate the pain

15     felt by those who have lost family or friends.  This hearing

16     is about a very narrow topic, and that is whether the

17     Government has met its burden to show that no possible

18     combination of conditions could possibly reasonably assure

19     the Court that Mr. Broussard will show up to hearings and

20     not pose a serious danger to the community.

21                And I'm going to apologize in advance, Your Honor,

22     if my remarks are less organized than they otherwise would

23     be.  Until about two hours ago I was preparing to argue

24     extensively about Mr. Broussard's knowledge and his intent

25     and the differences between the allegations in the

1    Indictment and the substance of the arguments in the

2    Government's motion; but as you know, the Government has now

3    conceded, and as Mr. Hollenhorst mentioned the Government

4    has now conceded at least for the purposes of this hearing,

5    that Mr. Broussard believed he had obtained something called

6    4-FA, not fentanyl.

7            And, you know, I'm not a chemist, Your Honor, but

8    a simple curious Google search will show that 4-FA is not in

9    the same galaxy as fentanyl.  It's something that's closer

10   to MDMA combined with Adderall essentially.  It is not

11   anywhere near the kind of deadly or dangerous drug that

12   fentanyl is.

13           And so the Government has also conceded that

14   Mr. Broussard distributed this substance believing it to be

15   4-FA, not fentanyl.  And that outside of this one mistaken

16   batch, the Government concedes that it has no evidence that

17   Mr. Broussard has ever distributed fentanyl before or after.

18           And this is important for a variety of reasons,

19   Your Honor, and not because it goes to whether the

20   Government can prove its claims against Mr. Broussard with

21   respect to the various counts regarding the deaths of

22   individuals, but it goes to whether Mr. Broussard is a risk

23   to other people.  And the gap between the Government's

24   language in its motion and the Government's language in the

25   Indictment and what Mr. Hollenhorst just said is enormous.

1    And frankly, Your Honor, this information should have been

2    in the motion; and more than that, it should have been in

3    the Indictment.  This is a very, very different case at this

4    point than what the Government has represented until just a

5    few hours ago.

6           What is left -- and just to be clear, when I --

7    for the purposes of this hearing, when I make

8    representations about Mr. Broussard's state of mind or any

9    of the facts of this case, I'm talking about what the

10   Government alleges and what the Government purports to have

11   evidence regarding.  I do not intend to concede, you know,

12   Mr. Broussard reserves his rights to challenge all the

13   factual allegations and any of the evidence the Government

14   has proffered.

15          But what's left of the Government's allegations

16   and theory of the case at this point after these

17   concessions, Your Honor, is an allegation that about when

18   Mr. Broussard was about 25, he made a mistake that has had

19   terrible, terrible consequences.  This case has transformed

20   from one that paints Mr. Broussard as a monster that

21   intentionally deceived people about what they were putting

22   into their bodies to a young person who did something, a

23   human mistake that had horrifying impacts on people and then

24   it didn't happen again.

25          This is essentially an allegation of recklessness,

1      Your Honor.  And this does not establish that Mr. Broussard

2      is a risk to the community by clear and convincing evidence

3      or that he would -- in fact, the Government's own motion

4      concedes that he is unlikely -- and I can quote the page

5      here, Your Honor, but I believe it's page 13 -- that he is

6      unlikely to establish anything like the business that he's

7      accused of operating while awaiting trial.

8              And so I want to break this up at this point, Your

9      Honor, into just a couple of different topics.  First, with

10     respect to Mr. Broussard's or additional facts that have

11     come to light since this Court first had Mr. Broussard

12     detained about four years ago before he was transferred to

13     Pennsylvania, and which hasn't really been discussed but

14     Mr. Broussard has been in detention for four years awaiting

15     charges in Pennsylvania that the Government's motion says

16     are essentially related to this case, and in fact the

17     allegations in that case stem from the same alleged drug

18     trafficking conspiracy.  He was in Pennsylvania for four

19     years.

20             During that time he got his GED, which Your Honor

21     will see as one of the exhibits that -- or as part of the

22     exhibit that the defense offered.  He took a number of other

23     classes and courses.  He had no -- no record of any

24     discipline, no discipline issues in prison or in jail.  Has

25     been essentially a model prisoner for the past four years,

1   which others would testify is -- including his aunt and his

2   father who are both -- I believe his father at least is on

3   the call here today and I know his aunt is -- is in keeping

4   with his personality.

5           He's not a violent person.  He has never been a

6   violent person.  He has no history of violence.  The

7   Government does not contend that he poses a particular risk

8   to any individuals or that he's likely to attack anybody or

9   do anything at all like that.  There's no guns involved in

10  this case.  There's no weapons involved in this case.

11          Mr. Broussard has essentially turned his life

12  around.  He went from a young, young high school dropout to

13  somebody with a GED who wants to become a sound engineer or

14  pursue an education in journalism.

15          His father, Phillip Powell, a Minneapolis

16  resident, has offered to allow Mr. Broussard to stay with

17  him at his home in Minneapolis, and has secured potential

18  job opportunities for him, which Your Honor will see in the

19  Pretrial Services report.  Mr. Broussard intends to work and

20  go to school, hopefully at MCTC should he be released.  And

21  Mr. Broussard is open to a wide variety of conditions that

22  the Court might consider, including a tether, which would --

23  should allay any fears that he would take off or anything

24  like that.

25          And Mr. Broussard has no history of missing court

1    dates, of failing to pay -- there's no evidence that he has

2    ever failed to pay.  There's no suggestion other than that

3    the allegations are severe that Mr. Broussard should stay in

4    jail.  And Mr. Broussard has been in jail for four years

5    related to charges that are about to be dismissed.  At some

6    point the Government needs to prove something to continue to

7    detain somebody who has done -- who has been a model

8    prisoner and who has established ties to the community and

9    who has -- frankly is a different person today than he was

10   four years ago.

11          Now, in addition, Your Honor, there's a reference

12   in the Government's motion and in the Pretrial Services

13   report I believe to a history of drug use.  Just to clarify,

14   Mr. Broussard contests that he ever said anything to

15   Pretrial Services admitting to drug use.  He has one petty

16   misdemeanor conviction for marijuana or marijuana

17   paraphernalia when he was 18 years old, which I believe,

18   Your Honor, to take that and transform that into drug abuse

19   or habit of drug abuse for somebody 12 years later who has

20   had no positive tests for any kind of drugs and who has been

21   in custody for 12 [sic] years, I think is a stretch to say

22   the least, and in fact inappropriate.  And if the -- if

23   there's a concern about any potential drug use,

24   Mr. Broussard would certainly submit to regular tests.

25   That's not going to be an issue.

1     So -- and I know Your Honor is familiar with this

2     from your past as a federal defender, but Mr. Broussard is

3     entitled to a presumption of innocence, and that -- and the

4     presumption of innocence applies with equal force today as

5     it did or as it would at his trial.  And Mr. Broussard has

6     certainly been accused of a variety of things and, for the

7     purposes of this hearing at least, the Government has

8     conceded that what it's actually accusing him of is quite

9     different than what the Indictment alleges, but --

10          THE COURT:  Back on that for a moment, Mr. Hennen.

11    I'm looking at the Indictment while you're talking.  I

12    understand that you're trying to suggest that the picture

13    painted in the Indictment was of an intentional distribution

14    of fentanyl.  What I see in the Indictment is count after

15    count of intentionally distributing a mixture and substance

16    that contained fentanyl.  I'm sure you've looked at the case

17    law.  The intent can attach to distribution of controlled

18    substances not fentanyl.

19          Show me where in here are these characterizations

20    that you claim that the Government has backed off of,

21    because I think that I'm misperceiving or I'm not sure I'm

22    understanding what you describe has a two-hour-ago sea

23    change in their theory of the prosecution.  I didn't read

24    them to say that he continued to distribute fentanyl after

25    this or that he ever intentionally distributed fentanyl.

1    That's not the impression that I got from this, so what am I

2    missing here?

3            MR. HENNEN:  Your Honor, you're -- the light in

4    which you read the allegations may be more generous, I

5    suppose, than what I read.  But when I read "knowingly and

6    intentionally distributes a mixture and substance containing

7    fentanyl," to me that says he knowingly distributed

8    something knowing that it contained fentanyl.

9            And again, I recognize that for the purposes --

10   and as I mentioned at the outset -- I recognize for the

11   purposes of proving a violation of the statute at issue may

12   be different, but my concern is primarily with how it

13   relates to what Mr. Broussard actually knew and how that

14   connects to essentially his propensity or the risk of danger

15   that he poses to society.

16           So when I read "knowingly and intentionally

17   distribute a mixture and substance containing fentanyl," I

18   read that as he knew it contained fentanyl.  And I recognize

19   that that's not necessarily how it would be read for the

20   proof of the elements of the case or of the underlying

21   count, but I read the Indictment as implying that he

22   intentionally distributed fentanyl.

23           THE COURT:  Okay.  So just to be clear, and then

24   I'll allow you to continue with your argument, Mr. Hennen,

25   maybe I read it more from the lens of somebody who has

1    worked with the statutes for a really long time.  I do not

2    perceive the Government as alleging, and thanks to your

3    clarification today I'm not going to assume there's an

4    allegation, that Mr. Broussard knowingly distributed the

5    fentanyl even when it was distributed, nor that he had

6    previously sought out and distributed fentanyl, nor that he

7    later sought out and distributed fentanyl.

8              I recognize that Mr. Hollenhorst has conceded for

9    today's purposes that that evidence doesn't exist.  That's

10   not before me.  I'm not going to get into what he could or

11   couldn't show at trial or sentencing.  But I didn't read the

12   Indictment with the tone that you did, so I don't

13   necessarily view the concessions as the sea change that you

14   do.  I'm not privy to what's been going on for years in this

15   case and I wouldn't presume to substitute my judgment for

16   your own.

17             But I guess I'm more allaying your concern that

18   that's not how I read these allegations.  I read them as

19   more austere and more tied to the facts that the Government

20   believes it can prove rather than maybe a layperson's

21   reading of the Indictment.

22             So continue, of course, with your argument.

23             MR. HENNEN:  I appreciate that, Your Honor, and

24   like I said, given that the -- these concessions were

25   reached such a short time ago, it was -- to the extent that

1    my argument is not completely updated, I apologize.

2          I wanted to move on to the weight of the evidence

3    just briefly, Your Honor.  There's a discussion of this --

4    well, actually before I do, there's references in the

5    Government's motion and proffer to allegations that aren't

6    really made in the Indictment here.  I'm referring

7    specifically to the incidents in Pennsylvania.  Those were

8    the subject of the prosecution in Pennsylvania which is

9    about to be dismissed two months before trial.

10          THE COURT:  Which incidents that Mr. Hollenhorst

11    referenced are the incidents in Pennsylvania?

12          MR. HENNEN:  If Your Honor takes a look at the

13    Government's motion, it's page -- it's on page 9.

14          THE COURT:  Okay.  Thank you.  I did read that and

15    thanks for pointing me directly to it.

16          MR. HOLLENHORST:  But, Your Honor, if I just may

17    interrupt for just a brief moment, we have included that

18    misconduct in the conspiracy count as overt acts 3m and 3n.

19          THE COURT:  Okay.  Thank you.  You can continue.

20    I didn't mean to interrupt.  Sorry.

21          Thank you, Mr. Hollenhorst.

22          Mr. Hennen, you can continue.  I didn't mean to

23    interrupt.

24          MR. HENNEN:  No, not a problem, Your Honor.  So

25    just briefly on the weight of the evidence, part of the

1    issue that the defense faces at this stage, and Your Honor

2    knows that it's a common issue, is that we haven't seen any

3    of the evidence.  So it's difficult for us to, you know,

4    make contentions about what the Government does and does not

5    have.

6              As Your Honor noted earlier, the Government made a

7    handful -- or I believe it was about six corrections to the

8    factual statements in its motion, you know, within the last

9    three hours, and so it's difficult for us to respond at all

10   to this point given that we don't have much.  But I do want

11   to say, Your Honor, that, again, you know, the prosecution

12   in Pennsylvania is about to be dismissed based off the same

13   alleged drug conspiracy.

14             I touched on the history and characteristics

15   aspect of this already so I don't feel that there's a need

16   to continue on it.  I just want to again emphasize that

17   Mr. Broussard has somewhere to stay with family.  He has a

18   potential job lined up.  He has -- he has received an

19   education.  The Government itself concedes that he's

20   unlikely -- in its motion it says he's unlikely to restart

21   any kind of similar drug trafficking conspiracy; and the

22   Court I'm sure can impose any number of conditions that

23   would make that even more unlikely.

24             And Mr. Broussard has no history of ever evading

25   court or summons or anything like that, and he will agree to

1    any number of conditions that will ensure his appearance

2    here today or in the future.

3            And then, you know, regarding the nature and

4    seriousness of danger to any person or the community, again,

5    Your Honor has already read this, the Indictment and the

6    allegations therein, to say that Mr. Broussard didn't

7    intentionally do this.  And I think that, to me, is a pretty

8    significant factor.  Mr. Broussard, again, has been in

9    custody for four years related to what amounts to an

10   allegation that he made a horrible, horrible mistake and the

11   Government concedes that he's unlikely to do that again

12   while trial or at least before his trial.

13           And at this point, Your Honor, there's got to come

14   a time where it's just, you know, this isn't the Unabomber.

15   We're not talking about Jeffrey Dahmer.  We're not talking

16   about Al Capone.  This is somebody who is a completely

17   different person than he was five years ago and the

18   defendant has proffered evidence that bears that out.  And

19   we are more than happy to work with the Court on any number

20   of potential conditions that would assuage any fear that

21   Mr. Broussard would engage in reckless conduct like what

22   he's accused of doing again.

23           But, you know, it's frustrating for me, Your

24   Honor, because at a certain point it strikes me as a denial

25   of due process.  Mr. Broussard has been in custody, again,

1    for four years and has had nothing proved against him and

2    now he has to start the process over.  And that -- I can't

3    imagine how frustrating that would be, but it just strikes

4    me as flying in the face of the way the system works or is

5    supposed to work.

6            For those reasons, Your Honor, we would be more

7    than happy to discuss any number of potential conditions.

8    I've already referenced a tether.  I've already referenced

9    the fact that he would have to stay with his father and

10   pursue either an education or work part time or both.  And,

11   you know, if the Court has any others that it's thinking of,

12   we would be more than happy to discuss them.

13           But with that, Your Honor, I don't know what else

14   to say.  Thank you.

15           THE COURT:  Okay.  Thank you, Mr. Hennen.

16           Mr. Hollenhorst, anything you would like to say in

17   response?

18           MR. HOLLENHORST:  Briefly, Your Honor.  I'm loathe

19   to bring counsel into this.  Counsel really are irrelevant

20   to this hearing.  But I must say that months ago I had a

21   conversation with Mr. Hennen where I explained the

22   Government's theory in the case.  There were no surprises.

23   There were no last-minute changes in our theory of the case.

24   The Indictment is what it is.  It stands for what it is and

25   we support every charge, every allegation within that

1    Indictment.

2            Secondly, this statement that we are somehow

3    conceding that it is unlikely that the defendant will engage

4    in further misconduct, we do say in our brief that all that

5    Broussard needs is another computer to continue his illegal

6    and dangerous -- illegal mass marketing drug venture.  And

7    this is perhaps what counsel is picking up on.  "Although

8    the risk of that happening may be small, the consequences of

9    him doing so would be severe."  We stand by that statement.

10           Your Honor, as to the defendant's lack of a

11   violent nature, we would remind the Court that the defendant

12   has been convicted of robbery.

13           As to the selection of Mr. Broussard's father as a

14   custodian, my understanding is that Mr. Phillip Powell has

15   not even reached out to probation to vet --

16           THE COURT:  That's no longer true,

17   Mr. Hollenhorst.  There was an e-mail communication.  There

18   were some difficulties in connecting, but if I were to

19   determine that that is an appropriate placement, I think we

20   could find our way to get some verification.  So that was

21   true as of a few hours ago, but I think that issue is on its

22   way to being remedied.

23           MR. HOLLENHORST:  Okay.  I would point out, Your

24   Honor, that we did a criminal history check on Mr. Powell.

25   He has a 1985 conviction for burglary.  He has a 1985

1     conviction for --

2              THE COURT:  You know what, Mr. Hollenhorst.  I'm

3     going to ask you to stop reading an uninvolved party's

4     criminal history into the record.  If you would like us to

5     go into a breakout room I will take care of that there.  But

6     I don't think that I need to hear that information to make

7     my decision, and I think that will be clear from my ruling.

8              MR. HOLLENHORST:  All right.  Your Honor.  And

9     it's a matter of public record anyway so we will rest on the

10    judicial knowledge on that.

11             So the other thing, too, Your Honor, is I can't

12    emphasize enough how important it is that the defendant did

13    nothing once he found out that these drugs were lethal.  He

14    had the opportunity to save -- actually I counted it up

15    now -- two lives and two serious bodily injuries, and he did

16    nothing.  He had their names.  He had his customers' names.

17    He knew what batch of what he thought was 4-FA had been

18    sent.  He knew at that time that something was seriously

19    wrong, and had he reached out to his customers they would

20    have been here today.  And some of the victims, some of the

21    parents are listening in right now and they know.  They know

22    which ones I'm talking about.

23             Your Honor, but adding insult to injury, he just

24    continued to deal drugs.  And yes, there is a component of a

25    recklessness here and perhaps not intention to kill.  But

1    what is really worse, one could argue that the defendant's

2    reckless disregard for human life is even worse than -- I'm

3    not saying it's worse than intentionally killing a person,

4    but it makes it so much more aggravating that people had

5    died and that he presumably knew this and continued to

6    recklessly distribute illegal drugs, both controlled

7    substances and controlled substance analogs.  And we think

8    that that wanton, reckless activity speaks volumes as to the

9    defendant's threat to our community.  That's all I have.

10            THE COURT:  Mr. Hollenhorst, is it your

11   understanding that following this fentanyl infused nightmare

12   batch of 4-FA, is it your allegation that Mr. Broussard

13   continued to obtain controlled substances from the same

14   source, or from China generally?

15            MR. HOLLENHORST:  Yes, Your Honor.

16            THE COURT:  Okay.  All right.  Anything else you'd

17   like to say, Mr. Hollenhorst?

18            MR. HOLLENHORST:  Nothing more, Your Honor.

19            THE COURT:  Okay.  Mr. Hennen, I'll give you the

20   last word.  Anything Mr. Hollenhorst raised that you would

21   like to address?

22            MR. HENNEN:  Yes, Your Honor.  With respect to the

23   prior conviction for robbery, Mr. Broussard was 16 years

24   old.  He was a minor.  My understanding of the facts of that

25   case is that he was along with a group of friends and

1      essentially got scared before they -- the people that he was

2      with engaged in the activity at issue and tried to run away,

3      but was essentially too slow.  And he -- the words that were

4      used, not to waive privilege or anything, were "chickened

5      out" basically and just didn't have that in him.

6            And I -- you know, Your Honor has already

7      addressed the issues with respect to Mr. Powell and I don't

8      think there's a need to get into that.

9            But I will note I do not believe that the

10     Government's proffer includes any evidence that

11     Mr. Broussard actually had a way to contact customers other

12     than through, you know, their physical address.  Again, I

13     haven't seen the Government's evidence but I haven't seen

14     anything that suggests that or that establishes that.  And

15     with that, that's all I have, Your Honor.

16            THE COURT:  Thank you.

17            All right.  I need to make very clear what my job

18     is today.  My job is not to punish Mr. Broussard.  My job is

19     not to make sure that he serves a down payment on a sentence

20     that he might receive.  I share Mr. Hennen's concern about

21     how long Mr. Broussard has been in custody.  I also know,

22     though, that that's in part because a complex and serious

23     case was working its way through the court system.  And in

24     the absence of any motion for speedy trial considerations,

25     that length of time, though undoubtedly frustrating, is not

1    a basis for release.

2         I'm going to acknowledge that Mr. Broussard has

3    engaged at remarkable efforts at self-improvement while he's

4    been in custody.  It's clear from the materials that I have

5    received that he has worked hard on himself.

6         I'm also going to reject the Government's

7    invitation that Mr. Broussard has shown no remorse.  I

8    always find that troubling when one of the first contacts

9    that somebody has with law enforcement after a horrible

10   event like this, they are also admonished about their right

11   to remain silent.  And Mr. Broussard has had counsel

12   throughout this proceeding and I'm not going to speculate as

13   to what's in his heart and I'm not going to hold his silence

14   against him, as I think there's a slight suggestion that I

15   ought to do by finding that he is not remorseful.  That will

16   be a question for Judge Nelson down the road if there is a

17   conviction or a plea in this matter and if there is a

18   sentencing.  That isn't appropriate for me to think of here.

19        I am, however, going to order that Mr. Broussard

20   remains in custody.  There are two reasons.  The first is --

21   and I'm just going to be very explicit about my thinking.

22   That's how I tend to operate on the bench and so I'm going

23   to show all my cards.  I thought about this very hard all

24   week.  I've read every scrap of information that was

25   provided by either side.  I've looked closely at the

1   Indictment, at the certificates, and at everything that I

2   have received from both sides.

3        Mr. Broussard is facing a 20-year mandatory

4   minimum and a guideline sentence that pushes those numbers

5   really into the stratosphere.  I may -- it doesn't matter

6   whether I think that's the right number.  It doesn't matter

7   whether Mr. Hennen thinks that that's ridiculous for an act

8   of recklessness.  The fact is the way these statutes work,

9   that is genuinely what Mr. Broussard is facing if he is

10   convicted of even one of several of the counts in the

11   Indictment.  That creates an overwhelming incentive to flee.

12        And the facts of this offense, the sophistication

13   of this offense, the international connections that

14   Mr. Broussard had to tap into in order to commit this

15   offense as alleged in the Indictment, are such that there

16   are easy means and sophistication to make that happen.

17        I also want to address the seriousness of this

18   conduct and the danger to the community.  I hesitate to

19   embrace Mr. Hennen's characterization of this as a horrible

20   mistake.  I'm going to accept for the time being all the

21   suggestions that have been made, frankly, by both sides that

22   Mr. Broussard believed he -- if even guilty, innocent until

23   proven guilty, these are allegations, absolutely -- but the

24   statute requires me to look at the nature and the

25   circumstances of the crime alleged.  There's a tension there

1     and I have to look at the Indictment.

2          I keep in mind that Indictments are issued based

3     on a showing of probable cause to a jury.  I, again, try to

4     read the Indictment and the other information in the sort of

5     most conservative lens that I can.  But even with that lens,

6     assuming that Mr. Broussard believed he was dealing a much,

7     much less lethal almost recreational party-type drug, when

8     he learned that that was not true, he kept doing it.  I'm

9     sure he desperately hoped that that would never happen again

10    and I'm not going to attach to him the intention or even the

11    cavalierness of the loss of life.  But nonetheless, fentanyl

12    comes from China when it claims to be other things and it

13    kills people, and the allegations before me are that that

14    conduct continued even after the death toll was apparent.

15         So I find both on the profound risk of flight

16    presented by the 20-year mandatory minimum and the

17    guidelines of 360 to life, and on the danger to the

18    community, not assuming intentional distribution of

19    fentanyl, but recklessly continuing to distribute even being

20    put on painful notice of the risks, that those prongs of the

21    statute are met.

22         I am not concerned at all about Mr. Broussard's

23    past criminal history.  If that were all that was before me,

24    I would order his release.  I am not concerned -- I'm not at

25    all concerned about the suggestion that he may have

1   possessed marijuana paraphernalia when he was 18.  I have no

2   doubt that I could address that and he would comply with

3   that requirement.  But the other factors that I have

4   identified are factors that I believe mandate continued

5   detention in this matter.

6          Mr. Hollenhorst, can you prepare a draft order for

7   my review emphasizing the factors that I have highlighted?

8          MR. HOLLENHORST:  Yes, Your Honor.

9          THE COURT:  Okay.

10          Let me say one additional thing.  It's not common

11   for us to have a lot of people watching a detention hearing.

12   I refer to the victims in this case as alleged victims.

13   That's not to suggest that their loss is alleged or that the

14   sadness of their deaths is alleged.  The part that's alleged

15   is the cause of their death and Mr. Broussard's alleged role

16   in it.  And so I just want to be clear that I'm not

17   minimizing that loss when I say that.  I am observing the

18   very important truth of the presumption of innocence in this

19   case.

20          Mr. Hennen, anything else on behalf of

21   Mr. Broussard at this time?

22          Oops, you're on mute, sir.

23          MR. HENNEN:  No, Your Honor.  If I could, if it

24   would be possible to have just a brief moment to talk to my

25   client?

1     THE COURT:  I was absolutely going to suggest that

2  at the end.  We'll make that happen.

3     MR. HENNEN:  Thank you.

4     THE COURT:  Mr. Hollenhorst -- let me clarify,

5  Mr. Hennen.  Do you believe you need to speak to

6  Mr. Broussard before we go off the record or would you like

7  to use the confidential room after we're done?

8     MR. HENNEN:  After we're done, Your Honor.

9     THE COURT:  Okay.  Mr. Hollenhorst, is there

10  anything else that you would like to address at this time?

11     MR. HOLLENHORST:  Nothing more, Your Honor.

12     THE COURT:  Okay.  Thank you for your arguments,

13  everyone.  Take care of yourself, Mr. Broussard.  We are in

14  recess and I'll ask our duty team to allow Mr. Hennen to

15  visit with his client in confidence.

16     Thank you.

17     MR. HENNEN:  Thank you, Your Honor.

18     (Court adjourned at 2:53 p.m.)

19          *     *     *

20     I, Carla R. Bebault, certify that the foregoing is

21  a correct transcript from the Zoom for Government record of

22  proceedings in the above-entitled matter.

23

24     Certified by:  s/Carla R. Bebault
                       Carla Bebault, RMR, CRR, FCRR
25