UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 19-101 (SRN)

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | GOVERNMENT'S POSITION ON |
| v. ) | SENTENCING |
| ) | |
| AARON RHY BROUSSARD, ) | |
| ) | |
| Defendant. ) | |

COMES NOW the United States of America, by and through its undersigned attorneys, Andrew M. Luger, United States Attorney for the District of Minnesota, and Thomas M. Hollenhorst and Melinda A. Williams, Assistant United States Attorneys, and submits the following position on sentencing concerning the defendant, Aaron Rhy Broussard. The government asks the Court to sentence the defendant to life imprisonment.

Introduction

In two short months, the defendant—a drug dealer—killed eleven young and vibrant people. He took them away from their families, their loved ones, and their communities. He extinguished the bright promise they offered the world. He caused untold suffering for many others who just barely survived. He did so for one reason—money.

As this Court knows, the defendant made money by obtaining drugs from China and selling them over the internet to customers in the United States. He tried to evade United States drug laws by describing his drugs as "plant food," but he was not fooling anyone. The defendant ran a dangerous business. His customers—professors, students, nurses,

and others struggling with addiction—sought out Adderall and other stimulant drugs—drugs designed to keep them awake and alert. The defendant bought these drugs from sketchy labs in China, labs that he knew sold all types of drugs, including fentanyl. He was warned by his suppliers to test his drugs before he distributed them. Sometimes he did. Other times, he did not bother. At least once before, the defendant encountered a "bad batch"—drugs that were not what they purported to be. Drugs that sickened and endangered his customers. He was not deterred.

In April and May 2016, the defendant sold what he initially thought to be an Adderall equivalent to customers around the country. Instead, it was fentanyl—pure, and deadly. When customers consumed the smallest of amounts—unaware that they had been dealt a deadly opioid—they quickly overdosed and most died. A lucky few survived, though many with lifelong consequences. What is even more egregious, even when the defendant knew his customers were overdosing, *he did nothing to stop it.*

Because of the defendant, 11 people are dead. Several others were seriously injured. The defendant could have stopped it and did not. He has never—*not once*—shown remorse. The government asks for the only just and fair sentence in this case—a sentence of life imprisonment.

Procedural History

On April 10, 2019, the defendant was charged in the Indictment with a multi-object drug conspiracy and with numerous related drug crimes. Doc. 1.[1] The majority of the

---

1. Upon unopposed government motions, the Court twice revised the Indictment to delete certain surplusage. *See* Doc. 161, 168.

counts alleged that the defendant's crimes caused death or serious bodily injury. *Id.* On March 31, 2022, a jury convicted the defendant on all 17 counts of the Second Revised Indictment and found that the defendant's criminal misconduct resulted in the deaths of 11 people and serious bodily injury to four others. Doc. 199, 201.

The Nature and Circumstances of the Offense

The Presentence Investigation Report ("PSR") accurately summarizes the facts of this case. *See* PSR ¶¶ 7-41. However, some things bear repeating. Because of the defendant's reckless and wanton drug trafficking activities, at least 11 people died and several others were seriously injured. On at least two occasions during the period of the conspiracy, the defendant, after learning that the drugs he was sending to his customers were causing serious overdoses, continued to market and sell those same drugs. Most importantly, in April and May 2016, the defendant distributed pure doses of fentanyl to dozens of customers, and he continued to market and distribute these drugs even after he learned that customers were overdosing. The defendant could have saved lives if he had given it any concern at all. In fact, even his China-based supplier inquired as to whether he had tested the drugs he was distributing. As many customers fell ill, and even after many had died, the defendant did nothing. The tragedy is that the defendant could have simply sent out another of his "blast" e-mails to warn customers of the lethal effects of the drugs he was sending; but, he did nothing. What's more, the defendant has shown no remorse for destroying the lives of so many victims and appears to be indifferent to the sadness and grief that weighs upon those left behind.

The Court sat through the trial and likely does not need to be reminded of the human tragedy and suffering caused by the defendant's actions. Yet, who could forget the "silent" but resounding testimony of Theodore Trotman, whose speaking ability and freedom of movement has been forever taken from him; or Donald Stiling who testified of the pain and permanent injuries inflicted upon him and the profound sadness from the loss of his girlfriend, Devon Masik; or Joel Secory who testified about the moment of terror when he realized his body was shutting down and he could do nothing about it; or Molly Sender who testified that she warned the defendant about her serious overdose, but he did nothing. And who could forget the riveting testimony of those left behind who, in the blink of an eye, lost their sons, daughters, brothers, sisters, husbands, and parents. Finally, who could forget the eleven lives that the defendant snubbed out – Stephen Fry, Timothy Robertson, Matthew Williams, Devon Masik, Jason Beddow, Daniel Flynn, Scott Beimel, Craig Karp, Vamsi Prasad, Patrick Reinsma, and Amanda Leach (and the tragic death of Caleb Smith that followed in the aftermath).

Victim Impact Statements

There is no one better to talk about the sadness, sorrow, loss and grief of those left behind than those who are suffering it first-hand. So we leave it to them to tell their stories in their own words. *See* PSR ¶¶ 42-49. The following is a selection of some of their many comments:

    a. <u>Mother of Patrick Reinsma</u>: I am 75 years old and I will not have the comfort of knowing for the rest of my life that I will never see my son again. [Patrick] was my youngest child and my only son. He traveled a lot for his job so usually, on his way home at night, he could call me or one of his sisters, or his friends. He kept in touch with just everyone he knew. He called me every Sunday on

4

his way to or from church. It's difficult to describe who he was but he was one of those people who could light up a room. If you ever met him, you would never forget him. He had a gift for remembering some little thing about everyone he met. His passing has left a void that will never be filled for me, his sisters, his cousins, his friends. He was a gift to all of us. Broussard is a murderer. He took the life of not only Patrick but 11 others and permanently disabled 4 more. He should never be released from custody to inflict more harm on others. Of the lives Broussard took who can say if one of them may have discovered a cure for cancer, or a way to stop global warming or written a wonderful piece of literature, or composed a magical piece of music. The possibilities of what they could have done are endless but we'll never know because of Broussard. *See* PSR ¶ 44.

b. <u>Parents of Daniel Flynn</u>: [Daniel] was our oldest son who was just getting to the stage of getting his life heading in a direction that would have been amazing for his son who was only 3 at the time. All that was stolen from him and us as his parents and brothers and sisters. These are things I want to remember about [him] and what he meant to so many: [He] was smart, good at whatever he did, put his whole self into everything because he wanted to do it right, funny with a dry sense of humor like his dad, had his dad's gleam in his eyes when he looked at you sometimes that made you wonder what he was thinking, kind, easy going, a little shy, generous, he loved to read and draw and knew his way around a computer, neat like no other man I know – probably had a bit of OCD but who doesn't, it just has a name now – most of all he loved with no conditions and he was a great daddy to [his son]. As far as sentencing, we believe [Broussard] should receive the maximum sentence allowed by law for his blatant disregard for the lives of all the victims. This was a senseless crime that forever changed the lives of so many and while nothing will ever bring any of them back, the ones left behind that loved them so much deserve to know that someone will pay a price for what they did and that we can hold our heads high knowing they did not die in [vain]. PSR ¶ 45.

c. <u>Father of Stephen Fry</u>: In speaking with the investigator for the case, I got the impression that many of Broussard's victims in this crime were wonderful people. I can say with certainty that Stephen was a wonderful person. My hope in [writing this] is to encourage you to keep Broussard away from society for as long as possible to reduce the likelihood that others like Stephen will suffer at his hands in the future. Stephen was extremely smart, often described as brilliant by his teachers. A Georgia Tech professor spoke at his memorial service, and said that in 45 years of teaching chemistry, he had never had a student as engaged as Stephen. Stephen began using psychoactive drugs when he was about 14 or even before, and was in several treatment and rehab programs during the last ten years of his life. He was showing strong signs of finally

having his addiction issues under control when he was 24, a year before his death. He through-hiked the entire Appalachian trail, got himself back into school at Georgia Tech, and was getting good grades. He had developed a pattern of helping others with addiction issues, and at his memorial service two young women spoke to me to say that they credited him with saving their lives. Broussard knew he was selling a lethal drug to people who had ordered a non-lethal drug. His complete lack of concern for the well-being of others suggests the kind of sociopathology that is not likely to change over time. Keeping Broussard locked away from society for life seems appropriate. *See* PSR ¶ 46.

d. <u>Theodore Trotman</u>: My heart stopped for 8 minutes, leading to anoxic brain injury, dual scotoma (legal blindness), secondary Parkinsonism, and a complete inability to speak. My quality of life has been profoundly affected. Before my injury, I was a university lecturer, a gifted linguist, and a powerlifter. After my injury, I can no longer interview for positions, much less do the job, in my chose[n field], or any other field. My mother has become my de facto full-time caregiver. I've received more than 75 hours of speech, physical, and occupational therapy. I recommend leniency, if an[d] only if [Broussard] expresses remorse for the deaths and serious bodily injury his actions caused. I cannot accurately assess the financial impact, to my life, as I was just embarking on a promising future career. There is no amount of money that would adequately replace what Aaron Broussard has taken from me. *See* PSR ¶ 47.

<u>The Criminal History of the Defendant</u>

The defendant has a prior juvenile adjudication for aiding and abetting simple robbery, and prior adult convictions for possession of drug paraphernalia and driving without a license. PSR ¶¶ 68-72. He has one criminal history point, which places him in criminal history category I. PSR ¶ 73.

<u>Guideline Range and Sentencing Recommendation</u>

The government agrees with the probation office that the defendant has a base offense level of 38 (*see* USSG § 2D1.1(a)(2)),[2] increased by two levels because the offense

---

2. All references to the Sentencing Guidelines refer to the 2016 Guidelines Manual, which was in effect at the time of the instant offenses. The parties agree with the probation office that the current manual would pose an ex post facto issue. *See* PSR ¶ 53.

6

involved the importation of an amphetamine analogue (*see* USSG § 2D1.1(b)(5)), and increased by two levels because the offense involved the distribution of drugs through mass-marketing by means of an interactive computer service (*see* USSG § 2D1.1(b)(7)). PSR ¶¶ 55-57.  This would result in a total offense level of 42 and a guideline range of 360 months to life imprisonment.  PSR ¶¶ 65, 73, 96.

<u>Premises Enhancement</u>

In addition to the enhancements recommended by the probation office, the government urges the Court to apply an additional two-level enhancement because the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance.  USSG § 2D1.1(b)(12).  This would increase the defendant's total offense level to 44 and result in a guideline sentence of life imprisonment. *See* USSGCh. 5, Pt. A (Sentencing Table).  The enhancement is strongly supported by the evidence.

The Sentencing Guidelines provide that "[i]f the defendant maintained a premises for the purpose of distributing a controlled substance, increase by 2 levels." USSG § 2D1.1(b)(12).  In related commentary, the Guidelines provide:

> Subsection (b)(12) applies to a defendant who knowingly maintains a premises (i.e., a building, room, or enclosure) for the purpose of manufacturing or distributing a controlled substance, including storage of a controlled substance for the purpose of distribution.
>
> Among the factors the court should consider in determining whether the defendant "maintained" the premises are (A) whether the defendant held a possessory interest in (e.g., owned or rented) the premises and (B) the extent to which the defendant controlled access to, or activities at, the premises.

> Manufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises. In making this determination, the court should consider how frequently the premises was used by the defendant for manufacturing or distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes.

USSG § 2D1.1, comment. (n.17).

The defendant knowingly maintained premises at 30 Fifth Avenue, Apartment 5, Hopkins, Minnesota. He leased the property and, by all accounts, was its sole occupant at the time of the instant offenses. The defendant also controlled access to the premises and all of the activities occurring therein.

The sole question for the Court to resolve, therefore, is for what "purpose" were the premises maintained? While the Guidelines state that drug trafficking "must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises," the Guidelines also state that drug trafficking "need not be the sole purpose for which the premises was maintained." USSG § 2D1.1, comment. (n.17). The Guidelines provide only two criteria for making this determination, namely, "how frequently the premises was used by the defendant for manufacturing or distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes." *Id.*

As to the first criterion, the government presented overwhelming evidence that the defendant used his apartment over a span of many months to manufacture,[3] distribute and

---

3. The term "manufacture" includes the packaging or repackaging of a drug or

store drugs. In fact, he ran his entire mass marketing drug business from his apartment and from nowhere else. He would receive drugs from China there, repackage them, market them from a computer in his apartment, place them in express mail envelopes and then leave his apartment for a short time to mail the drugs to his customers at a nearby post office. For almost two years, the defendant conducted hundreds of drug transactions on a daily basis in this manner from his apartment. Furthermore, during a search of the defendant's apartment on December 6, 2016, officers found a cornucopia of drugs, the defendant's computer (and computer accessories) used to order and market the drugs, a pill making machine and hundreds of pill capsules, mylar baggies, scales, express mail envelopes, packages sent from China, and numerous other drug-related items. As such, the first criterion (i.e. the frequency of the use of the premises for drug trafficking) weighs heavily in the government's favor.

As to the second criterion, there is no evidence to suggest that the premises was ever used for lawful purposes other than to provide a residence for the defendant at the same time he was engaging in his quotidian drug trafficking activities. The Guidelines are silent as to whether residing at the premises should even be considered as a factor to weigh in a defendant's favor; but, it is clear from the case law that this factor provides scant support for the defendant. *See, e.g., United States v. Miller*, 698 F.3d 699 (8th Cir. 2012) (upholding enhancement where residence was defendant's primary residence which she used for three drug transactions); *United States v. Wallace*, 822 F. App'x 502, 503-04

---

other substance. 21 U.S.C. § 802(15).

(8th Cir. 2020) (upholding enhancement where defendant sold marijuana from his principal residence and where officers later seized drugs, firearms, ammunition, and drug-related items); *United States v. Owens*, 966 F.3d 700, 710 (8th Cir. 2020) (finding no error in applying enhancement where police saw defendant leave his house immediately before selling drugs on three occasions and where the police later seized drugs, guns, and drug paraphernalia from two rooms and the basement of the residence); *United States v. Cardenas-Sanchez*, 784 F. App'x 287 (5th Cir. 2019) (rejecting defendant's claim that because he lived at his home with his family and only temporarily stored drugs there, the enhancement should not apply); *United States v. Leggett*, 800 F. App'x 378, 381 (6th Cir. 2020) (affirming district court's application of premises enhancement where evidence suggested defendant used residence for storage of drugs and drug transactions and the police later found a scale, packaging material, three cell phones, and $700 in the home); *United States v. Flores-Olague*, 717 F.3d 526, 533-34 (7th Cir. 2013) (upholding enhancement where defendant lived at the premises and sold and stored drugs there on a daily basis for three years); *United States v. Morris*, 807 F. App'x 906, 909-10 (11th Cir. 2020) (upholding enhancement where defendant sold drugs outside her residence and stored small amounts of drugs and packaging materials inside the residence).

In concluding that the enhancement was applicable where a defendant had used his residence to store marijuana on several occasions, the Fifth Circuit recently stated:

> We conclude that Galicia's premises had at least two primary uses: (1) as his residence, and (2) as a storage site for drug distribution. These primary uses need not be equivalent. Galicia may have lived in the premises and raised his family there for thirty-five years, but we agree with the district court that the premises were eventually used on a continuing basis for the

10

storage and distribution of drugs. Hence, the long-term, residential quality of the premises cannot shield Galicia from this enhancement—indeed, if that were the case, a drug dealer could effectively immunize his home, provided he lived there long enough.

*United States v. Galicia*, 983 F.3d 842, 844-45 (5th Cir. 2020).

The Sixth Circuit in the *Leggett* case discussed the relatively low quantum of evidence needed to support the enhancement for residential premises:

Leggett contends that the distribution of drugs was not "the primary purpose" of his Cobb Avenue residence. But a defendant may qualify for the drug house enhancement so long as one of his primary or principal uses for the premises is the distribution of drugs. This is a relatively low bar: drug storage on the property and transactions on the property will usually suffice. At bottom, the question is whether Leggett's home played a significant part in distributing drugs.

*Leggett*, 800 F. App'x at 381 (cleaned up).

Here, the evidence is simply overwhelming that the defendant's apartment "played a significant part" in distributing drugs. As such, a two-level enhancement should be applied under § 2D1.1(b)(12).

### Enhancement for Importing an Amphetamine Analogue

The defendant initially objected to the probation office's recommendation of a two-level enhancement for importation of an amphetamine analogue. *See* PSR at 26.[4] This objection has no support in the law or facts of this case. The Sentencing Guidelines provide that the enhancement applies where "the offense involved the importation of amphetamine . . . ." USSG § 2D1.1(b)(5). Significantly, the Guidelines provide that

---

[4]. The defendant has apparently now withdrawn his objection by failing to raise it in his sentencing position. See Doc. 230.

11

analogues fall under this provision. USSG § 2D1.1, comment (n.6) ("Any reference to a particular controlled substance in these guidelines includes all salts, isomers, all salts of isomers, and, except as otherwise provided, *any analogue of that controlled substance*.") (emphasis added).

The government proved at trial that 4-Flouroamphetamine ("4-FA") is an analogue of amphetamine and that in December 2014 and January 2015 the defendant arranged the importation of two packages from China, which contained sizeable quantities of 4-FA. *See* GEs S-1 to S-5; GEs GG-1, GG-2. Moreover, it is clear from the defendant's various e-mails and website pages that he actively marketed 4-FA, received quantities of 4-FA from his China-based suppliers, and then sold 4-FA to various customers. Finally, the jury convicted the defendant of having conspired with others to distribute 4-FA. In short, the evidence was overwhelming that the offense involved the importation of an amphetamine analogue and that the enhancement therefore applies.

<u>The History and Characteristics of the Defendant</u>

The defendant is 31 years old and was born in Evanston, Illinois. PSR ¶ 77. He has three siblings. *Id.* The defendant was initially raised by his mother in Illinois. PSR ¶ 78. They later relocated to Louisiana. *Id.* The defendant would at times live with his father. *Id.* His parents both had a history of substance abuse. PSR ¶ 79.

The defendant has never been married and has no children. PSR ¶ 80. Prior to his arrest, he lived alone in his apartment in Hopkins. PSR ¶ 81. The defendant has hypertension for which he receives medication. PSR ¶ 82. He also has mental health

issues and a history of substance abuse, which are described more fully in the PSR. *See* PSR ¶¶ 83-87.

The defendant never finished high school, but he reports that he earned his GED while incarcerated in Pennsylvania. PSR ¶¶ 88-89. He has never been formally employed and has supported himself through odd jobs and by selling drugs. PSR ¶ 91. The defendant has no assets and does not appear to have the ability to pay a criminal fine within the established fine range. PSR ¶¶ 92-94.

## The Needs of Sentencing

It is hard to imagine a more serious drug case. The defendant's drug trafficking activities killed at least 11 people and injured many others. What is more, the defendant has shown no remorse for his actions. His decision to distribute lethal drugs to his customers (even after he discovered that some had become seriously ill) is simply reprehensible. Those who died were plucked from this world unaware that they were dealing with a person who cared nothing about them and only about the profits he was making from selling drugs. Those who survived will live with physical and mental trauma for the rest of their lives. And those who suffered the loss of their loved ones, will never be the same.

Considering the § 3553(a) factors as a whole, the government asks the Court to impose a sentence of life imprisonment. This sentence would serve the needs of sentencing to reflect the seriousness of the offenses, to promote respect for the law, to provide just punishment, to afford adequate deterrence, to protect the public from further

crimes of the defendant, and to avoid unwarranted sentencing disparities among defendants.

WHEREFORE, the government asks this Honorable Court to impose a sentence of life imprisonment.

Dated:   July 26, 2022						Respectfully submitted,

								ANDREW M. LUGER
								United States Attorney

								s/ *Thomas M. Hollenhorst*
								BY:   THOMAS M. HOLLENHORST
								Assistant United States Attorney
								Attorney ID No. 46322

								s/ *Melinda A. Williams*
								BY:   MELINDA A. WILLIAMS
								Assistant United States Attorney